[No. G031877. Fourth Dist., Div. Three. Apr. 5, 2005.]

SOLE ENERGY COMPANY et al., Plaintiffs and Appellants, v. PETROMINERALS CORPORATION et al., Defendants and Appellants.

**COUNSEL**

Hornberger & Brewer, Nicholas W. Hornberger and James F. Lindsay for Plaintiffs and Appellants.

Mazda Butler, Mark N. Mazda and Mark J. Butler for Defendants and Appellants.

## Opinion

## FYBEL, J.—

### Introduction

May putative shareholders recover as damages the corporation's future profits allegedly lost as a result of tortious conduct directed to the shareholders individually and occurring before the corporation was formed? We conclude, under the facts of this case, any such lost profits belong to the corporation and cannot be recovered as damages by individual shareholders in a nonderivative suit.

The jury returned a verdict against defendants Petrominerals Corporation (Petrominerals) and Daniel H. Silverman in an amount in excess of $20 million on causes of action for interference with contractual relations and interference with prospective economic advantage. Plaintiffs contended Petrominerals and Silverman tortiously interfered in a transaction by which a corporation called Sole Energy Company (Sole Energy Corporation) was to acquire the stock and assets of a corporation called Hillcrest Beverly Oil Corporation (HBOC). Two of the plaintiffs were to be shareholders of Sole Energy Corporation, but it never issued stock. Plaintiffs sought as damages the future profits Sole Energy Corporation purportedly would have earned had the transaction been consummated.

The trial court granted a nonsuit in favor of Silverman on the causes of action for fraud and conspiracy, granted some of the motions for judgment notwithstanding the verdict (JNOV) brought by Petrominerals and Silverman, denied other of their JNOV motions, denied Silverman's motion for a new trial, and granted Petrominerals' motion for a new trial on any causes of action not covered by the rulings on the JNOV motions.

We conclude: (1) None of the plaintiffs could recover Sole Energy Corporation's alleged lost profits in this nonderivative lawsuit; (2) plaintiffs failed to present evidence that Silverman interfered with a contractual relationship; and (3) plaintiffs failed to present evidence that Silverman interfered with a prospective economic relationship or engaged in conduct that was wrongful apart from the interference itself. We therefore affirm the granting of JNOV motions, reverse the denial of JNOV motions, and remand with directions to the trial court to strike the punitive damages awarded against Petrominerals. Plaintiffs do not challenge the nonsuit in Silverman's favor on the fraud and conspiracy causes of action, and we lack jurisdiction to address plaintiffs' challenge to the order granting Petrominerals a new trial.

## FACTS

Thomas A. Swaney is the sole owner and president of Harwood Capital Corporation (Harwood), a subchapter S corporation. Swaney, Harwood, and Richard F. Borghese, a petroleum engineer, were the partners of Sole Energy Company, an informal partnership (referred to as Sole Energy Partnership to distinguish it from Sole Energy Corporation) that was formed sometime in the spring of 1999.[1] On December 30, 1999, Sole Energy Corporation was incorporated in the State of Texas. Sole Energy Corporation never issued stock.

HBOC is an oil and gas company. Kaymor Petroleum Products (Kaymor) owns a gas processing plant abutting HBOC's wells. Morris V. Hodges was the president of both HBOC and Kaymor. Nevadacor Energy, Inc. (Nevadacor) is a Nevada corporation and apparently owned HBOC's stock.[2]

Petrominerals is a California corporation engaged in the acquisition, development, and production of crude oil and natural gas. During the events that are the subject of this case, Hodges was Petrominerals' president and chief executive officer. Silverman worked as a consultant for HBOC in the capacity of an independent contractor from April 1999 to August 31, 1999. Silverman was Petrominerals' vice-president of business development and chief operating officer from September 1, 1999 through October 2000.

While working as a consultant for HBOC, Silverman analyzed a potential joint venture between Petrominerals and HBOC. On July 8, 1999, Silverman prepared a letter to HBOC regarding share valuations resulting from such a joint venture, stating: "[T]here is good potential for Petrominerals shareholders and the [HBOC] shareholders to see significant appreciation. This should make the story more convincing for both boards as why this combination would benefit both entities."

In July 1999, Borghese and Swaney met with Hodges to discuss acquiring HBOC's stock and oil- and gas-related assets from Nevadacor. Borghese and Swaney had learned that Hodges was a principal of Petrominerals, that Petrominerals had cash but no other assets, and that Petrominerals intended to

---

[1] Borghese, Swaney, Harwood, and Sole Energy Partnership are referred to collectively in this opinion as Plaintiffs. Sole Energy Corporation was the initial plaintiff, but is not a party to this appeal. As explained in *Sole Energy Co v. Petrominerals Corp.* (2005) 128 Cal.App.4th 187 [26 Cal.Rptr.3d 790] (*Sole Energy I*), the trial court stayed the case as to Sole Energy Corporation when an appeal was taken from an order granting Sole Energy Corporation's motion for a new trial following summary judgment.

[2] The term Defendants collectively refers in this opinion to all the defendants—HBOC, Kaymor, Nevadacor, Hodges, Petrominerals, and Silverman—not just the two defendants against whom the case was tried.

use its cash to buy oil and gas properties. So, when Borghese and Swaney met with Hodges, they asked him whether Petrominerals had plans to purchase HBOC. Hodges replied that Petrominerals would not purchase HBOC because (1) there was a conflict of interest, and (2) Petrominerals did not have enough money to buy HBOC. Hodges told Borghese and Swaney to continue the negotiations with Silverman.

Borghese and Silverman met on August 12, 1999. Silverman told Borghese that Petrominerals had no interest in buying HBOC due to a conflict of interest. Silverman also said he did not know whether Petrominerals had in the past been interested in buying HBOC. But on the day before meeting with Borghese, Silverman had faxed a letter to Hodges, stating: "Not to belabor the point with Petrominerals, but I do think it is possible for P[etrominerals] to purchase [HBOC] if I can go out and bring in some of that mezzanine financing." According to Silverman, he did not tell Borghese about that potential transaction because Borghese did not ask about it.

On December 16, 1999, Borghese submitted a letter of intent to Nevadacor. The letter of intent proposed an entity named Sole Energy Company purchase HBOC's stock and oil- and gas-related assets from Nevadacor for $7.5 million. Although Borghese signed the letter of intent on behalf of "Sole Energy Company," the letter was prepared on letterhead stationery with the name Sole Energy Company, LLC, an entity which never was formed.

The letter of intent stated it was "non-binding" and included the following language regarding expiration and termination: "Except as provided in sections 6 through 11, both inclusive, this letter shall represent a non-binding letter of intent between the parties. This letter of intent shall expire on December 17, 1999, 5:00 CST. Any party may terminate this letter of intent after January 31, 2000, upon written notice to the other parties, or at any time by all parties with their mutual written consent." The letter of intent concluded: "If the foregoing accurately represents your understanding of our agreement, please indicate by signing in the spaces provided below, and return a copy to us for our records. Upon receipt of a signed copy of this letter of intent, we will instruct our attorneys to begin preparation of a definitive Stock Purchase Agreement."

On December 23, 1999, Hodges signed the letter of intent on behalf of HBOC and Kaymor. On December 27, 1999, William Herder signed the letter of intent on behalf of Nevadacor. Sole Energy Corporation was incorporated on December 30, 1999. Borghese intended Sole Energy Corporation to assume Sole Energy Company's position in the letter of intent, and later drafts of an agreement to purchase HBOC's stock identify Sole Energy Corporation as the buyer.

Silverman was not involved in negotiating the terms of the letter of intent and, after the meeting with Borghese in August 1999, did not speak with Borghese or Swaney until February 3, 2000. On that date, Silverman spoke with Swaney at a trade show and congratulated him on obtaining mezzanine financing for the transaction contemplated by the letter of intent. Neither Borghese nor Swaney had further contact with Silverman.

On February 18, 2000, Borghese and Swaney received a formal commitment to provide financing for purchasing HBOC. According to Borghese, obtaining financing "represent[ed] 80-some percent of putting the deal together." Borghese telephoned Hodges to tell him about the financing commitment. The conversation turned into an argument over deal points and ended with Hodges hanging up. On the same day, an attorney for Sole Energy Corporation wrote a letter to Nevadacor's attorney, stating: "[I]t seems to me that our clients are at opposite ends of the spectrum on this transaction. . . . If your clients have changed their minds and if the deal can only go forward on the basis of your comments, one of two things must happen—either there will be no transaction between the parties because of their failure to agree or our clients see the necessity for a very substantial reduction in the purchase price to reflect the increased risks they will have to take in the transaction, as well as increased due diligence costs and delay."

On February 22, 2000, Swaney telephoned Hodges to discuss the transaction. During their telephone conversation Swaney and Hodges reached an oral agreement for Sole Energy Corporation to purchase HBOC's stock and oil- and gas- related assets. Swaney took notes of the conversation but Swaney did not send his notes to Hodges. The notes did not contain a purchase price or a closing date and did not include all the terms of the proposed sale. On February 23, lawyers for Borghese and Swaney prepared a draft stock purchase agreement that did not include a purchase price.

On February 25, 2000, Nevadacor and Kaymor informed Sole Energy Corporation in writing "they wish[ed] to terminate the negotiations and the Letter of Intent dated December 16, 1999."

Also in late February 1999, the chairman of Petrominerals' board of directors asked Hodges "if Petrominerals at this juncture should consider making an offer" for HBOC. Hodges replied, "nothing can happen there until after March 1." On March 10, 2000, Petrominerals and Nevadacor entered into a nonbinding letter of intent, prepared by Silverman, to sell HBOC's stock to Petrominerals for $6.7 million and 200,000 shares of Petrominerals'

stock. Silverman tried to obtain financing for the Petrominerals/Nevadacor transaction from the same bank that had provided Sole Energy Corporation a financing commitment. The bank would not consider providing Petrominerals financing unless it obtained a waiver from Sole Energy Corporation and Borghese. In March 1999, Hodges called Borghese and offered him a job with Petrominerals. Borghese declined.

The Petrominerals/Nevadacor transaction was terminated because Petrominerals could not obtain the necessary financing. Silverman's contract with Petrominerals expired about one month later.

PROCEDURAL HISTORY

I. THE COMPLAINT

On May 25, 2000, Sole Energy Corporation filed a verified complaint alleging causes of action for intentional interference with contractual relations, intentional interference with prospective economic advantage, fraud, and breach of contract. Defendants successfully moved for summary judgment on the ground Sole Energy Corporation had not been incorporated when the letter of intent was signed and therefore lacked standing to sue.

Sole Energy Corporation moved for reconsideration of the order granting summary judgment. The trial court deemed the motion for reconsideration to be a motion for a new trial and granted it. The order granting a new trial is the subject of our opinion in *Sole Energy I, supra,* 128 Cal.App.4th 187.

Sole Energy Corporation also moved for leave to amend the complaint to add new plaintiffs with standing. The trial court granted the motion, and a first amended complaint was filed December 6, 2001. The first amended complaint added four new plaintiffs: Sole Energy Partnership, Swaney, Borghese, and Harwood.

Petrominerals, Silverman, and Nevadacor answered the first amended complaint, but HBOC, Hodges, and Kaymor did not answer. Defaults and a default judgment later were entered against HBOC, Hodges, Kaymor, and Nevadacor as a sanction for alleged discovery abuses. The appeals from the default judgment against HBOC, Hodges, Kaymor, and Nevadacor are the subject of our opinion in *Sole Energy Co. v. Hodges* (2005) 128 Cal.App.4th 199 [26 Cal.Rptr.3d 823] (*Sole Energy II*).

## II. The Trial and Jury Verdict

The trial court stayed the case as to Sole Energy Corporation after Defendants appealed from the order granting the motion for reconsideration. The case proceeded only on the claims of the newly added plaintiffs—Sole Energy Partnership, Swaney, Borghese, and Harwood—and was tried to a jury on their claims against Petrominerals and Silverman for interference with contractual relations, interference with prospective economic advantage, fraud, and conspiracy. During trial, the court granted Silverman's motion for a nonsuit on the fraud and conspiracy claims.

The jury returned a verdict in favor of Plaintiffs and against Silverman and Petrominerals in the total sum of $20,902,416.29, plus interest. The verdict did not differentiate between causes of action, but divided the damages as follows:

*Compensatory Damages:*

Swaney v. Petrominerals: $11.909 million

Swaney v. Silverman: $1.2 million

Borghese v. Petrominerals: $3.909 million

Borghese v. Silverman: $391,000

Harwood v. Petrominerals: $189,416.29

Harwood v. Silverman: $19,000

Sole Energy Partnership v. Petrominerals: $250,000

Sole Energy Partnership v. Silverman: $25,000

*Punitive Damages:*

Swaney v. Petrominerals: $1.5 million

Swaney v. Silverman: $5,000

Borghese v. Petrominerals: $1.5 million

Borghese v. Silverman: $5,000

A judgment on the jury verdict was entered on October 15, 2002.

### III. POSTTRIAL MOTIONS

On November 18, 2002, Petrominerals and Silverman filed a total of seven JNOV motions and a notice of intention to move for a new trial listing 12 grounds. Petrominerals and Silverman filed separate memoranda of points and authorities in support of the new trial motion. On January 17, 2003, the trial court entered a minute order with its rulings on the posttrial motions. The nature of and the trial court's ruling on each motion are as follows:

*JNOV Motion 1.* Motion by Silverman as to all Plaintiffs on the causes of action for interference with contractual relations and interference with prospective economic advantage. The trial court stated: "It appears that plaintiffs have offered evidence to support that Silverman's interfering conduct was wrongful independent of the alleged interference with prospective economic advantage, but not as to alleged interference with contractual relations, based upon the evidence offered by Silverman that the contract ultimately was that which was created on 02-22-00 and terminated on 02-25-00, as plaintiffs do not cite any evidence in their opp[osition] as to wrongful conduct by Silverman during the short duration of said contract or, in the alternative, to confirm that said contract actually terminated after the time in which Silverman allegedly wrongfully acted." The court granted the motion with respect to interference with contractual relations and denied the motion with respect to interference with prospective economic advantage.

*JNOV Motion 2.* Motion by Petrominerals and Silverman as to Swaney and Borghese on all causes of action on the ground there was no evidence either Swaney or Borghese suffered any lost profits. The trial court ruled that Swaney and Borghese had no right to recover lost profits, stating: "It appears that the damages offered by plaintiff[s'] own expert relate solely to damages suffered by Sole Energy, the corporation, and such damages are owed solely to the corporation, not its shareholders." The court, granting the motion, reduced the damages awarded to Swaney by $11.909 million and reduced the damages awarded to Borghese by $3.909 million.

*JNOV Motion 3.* Motion by Petrominerals and Silverman as to Swaney on all causes of action on the ground there was no evidence Swaney suffered any lost profits. Plaintiffs' expert testified the lost profits were for Borghese and Harwood, Swaney's S corporation. "Based on the state of evidence and

authority," the court concluded, "it appears that the award of lost-profit damages to Swaney, the individual, rather than . . . the corporate S is improper." The trial court granted the motion and declined to amend the judgment to award damages to Harwood.

*JNOV Motion 4.* Motion by Petrominerals and Silverman as to Sole Energy Partnership on the ground there was no evidence of damages suffered by Sole Energy Partnership. The court denied the motion.

*JNOV Motion 5.* Motion by Petrominerals and Silverman as to Sole Energy Partnership on the ground it never filed a fictitious business name statement as required by California law to maintain a lawsuit. Petrominerals and Silverman do not challenge the trial court's denial of that motion.

*JNOV Motion 6.* Motion by Silverman as to all Plaintiffs on the ground there was no evidence Silverman actually disrupted or interfered with an alleged contract or prospective economic advantage. The trial court ruled: "Plaintiffs have offered no evidence to support that Silverman acted wrongfully during the short term of the 2-22-00 contract or that the contract did not terminate until after the times of . . . Silverman's [alleged] wrongful conduct occurring after its creation." The court granted the motion with respect to interference with contractual relations and denied the motion with respect to interference with prospective economic advantage.

*JNOV Motion 7.* Motion by Silverman to set aside the punitive damages awarded to Swaney and Borghese. The trial court granted the motion and struck the punitive damages on the ground the evidence was insufficient to establish Silverman acted with oppression, fraud, or malice.

*Petrominerals' Motion for a New Trial.* The trial court granted Petrominerals' motion for a new trial on the ground the evidence was insufficient to support the jury's verdict. The motion was denied on the other grounds. The trial court held: (1) no evidence was presented that Petrominerals or Silverman engaged in any wrongful conduct during the period in which the oral contract was in effect; and (2) any damages were suffered by Sole Energy Corporation, which was not a party at trial.

*Silverman's Motion for a New Trial.* The trial court denied Silverman's motion for a new trial, holding there were no irregularities in the proceedings and no errors in law supporting a new trial.

### IV. ENTRY OF JUDGMENTS FOLLOWING THE RULINGS ON THE POSTTRIAL MOTIONS

Following the ruling on these posttrial motions, the trial court ordered Petrominerals and Silverman to prepare a proposed statement of reasons and

facts supporting the grant of the motions. On January 21, 2003, Petrominerals and Silverman served counsel with a proposed judgment and a statement of reasons supporting the grant of the new trial motion. The proposed statement of reasons was not prepared in the standard format of a proposed order (with a blank line for the trial judge's signature). No statement of reasons signed by the court appears in the record.

On January 27, 2003, Plaintiffs filed objections to the proposed judgment, contending it did not accurately reflect the trial court's rulings on the JNOV and new trial motions. On January 30, the trial court entered as its judgment the proposed judgment prepared by Petrominerals and Silverman without ruling on the objections. That judgment (the January Judgment) provides, in part: "Plaintiffs Thomas A. Swaney and Richard F. Borghese shall take nothing from Defendants Petrominerals Corporation and Daniel H. Silverman." Notice of entry of the January Judgment was served on February 11, 2003.

Plaintiffs filed no postjudgment motions and on February 19, 2003 filed a notice of appeal from the January Judgment. The notice of appeal does not mention the order granting Petrominerals' motion for a new trial. On February 27, Petrominerals and Silverman filed a notice of appeal (entitled a notice of cross-appeal) from (1) the judgment based on jury verdict dated October 15, 2002 (set aside on January 17, 2003) and (2) the denial of any part of Petrominerals' and Silverman's JNOV motions. The appeals filed February 19 and February 27, 2003 are the subject of this opinion.

After filing the notice of appeal, Plaintiffs applied ex parte asking the trial court to review their objections to the January Judgment. On March 12, 2003, after the ex parte hearing, the trial court entered a "Judgment by Court Modifying Judgment on Jury Verdict" (the March Judgment) awarding $1.635 million in compensatory damages in favor of Plaintiffs and against Silverman, plus interest from the date of entry of judgment on the jury verdict. In a minute order dated April 1, 2003, the court expressed its belief the January Judgment did not accurately reflect the court's rulings on the posttrial motions. Silverman has appealed from the March Judgment, and Silverman and Petrominerals have appealed from the subsequent order granting Plaintiffs' motion to tax costs. In *Sole Energy Co. v. Petrominerals Corp.* (Apr. 5, 2005, G032255) [nonpub. opn.] (*Sole Energy IV*), we reversed the March Judgment on the ground the trial court lacked jurisdiction to modify the January Judgment.

STANDARD OF REVIEW

■ " 'The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict [citations]. The

trial judge cannot reweigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] "A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is *no substantial evidence* to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied." [Citation.]' " (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877–878 [151 Cal.Rptr. 285, 587 P.2d 1098], italics added.)

■ "In passing upon the propriety of a judgment notwithstanding the verdict, appellate courts view the evidence in the light most favorable to the party who obtained the verdict and against the party to whom the judgment notwithstanding the verdict was awarded. [Citations.] In other words, we apply the substantial evidence test to the jury verdict, ignoring the judgment." (*Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 546 [138 Cal.Rptr. 705, 564 P.2d 857], overruled on other grounds in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

ANALYSIS

I. APPEAL OF SOLE ENERGY PARTNERSHIP, BORGHESE, SWANEY, AND HARWOOD

A. *Grant of JNOV Motion 2 Affirmed: Plaintiffs Individually Cannot Recover Future Corporate Lost Profits as Damages.*

The jury awarded Swaney $11.909 million and Borghese $3.909 million in compensatory damages against Petrominerals. The jury verdict does not reveal the evidentiary basis for those awards. The compensatory damages awarded against Petrominerals are the same as the amounts Plaintiffs' expert, Townes Pressler, opined was the amount Sole Energy Corporation would have made in profit if the transaction for the purchase of HBOC had been consummated, apportioned according to Borghese's and Swaney's respective shareholder interests in Sole Energy Corporation.[3]

---

[3] Pressler testified that if the HBOC/Sole Energy transaction had been consummated, then the acquiring entity (Sole Energy Corporation) would have received a projected net income of about $80 million over the remaining 15 years of the HBOC oil and gas field's life. Pressler discounted this projected income to present value and multiplied the resulting number by the respective ownership interests of Borghese and Harwood. Pressler assumed Borghese would own 11 percent of Sole Energy Corporation and Harwood would own 34.45 percent of Sole

The trial court granted Petrominerals and Silverman's JNOV motion 2 on the ground the lost profit damages awarded by the jury belonged to Sole Energy Corporation and could not be recovered by its shareholders. The court's order reduced the amount of damages awarded to Borghese and Swaney by, respectively, $3.909 million and $11.909 million.[4]

Borghese and Swaney argue the order granting JNOV motion 2 is erroneous because they, as putative shareholders of Sole Energy Corporation, could recover its lost profits.[5] In making this argument, Borghese and Swaney rely primarily on *Sutter v. General Petroleum Corp.* (1946) 28 Cal.2d 525 [170 P.2d 898] (*Sutter*) and *Nathanson v. Murphy* (1955) 132 Cal.App.2d 363 [282 P.2d 174] (*Nathanson*). Petrominerals and Silverman, relying primarily on *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 126 [84 Cal.Rptr.2d 753] (*Nelson*), argue lost profit damages belong exclusively to the corporation and cannot be recovered by individual shareholders, except through a derivative lawsuit. With respect to JNOV motion 2, Petrominerals and Silverman do not challenge Pressler's testimony or contend lost profits were speculative.

■ The parties correctly frame the issue as whether Sole Energy Corporation's future lost profits were derivative (belonging to the corporation alone) or individual to the shareholders. Whether a cause of action is derivative or can be asserted by an individual shareholder is determined by considering the wrong alleged. " '[T]he action is derivative, i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets.' [Citations.] '. . . The stockholder's individual suit, on the other hand, is a suit to enforce a right against the corporation which the stockholder possesses as an individual.' [Citation.]" (*Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 106–107 [81 Cal.Rptr. 592, 460 P.2d 464]; see also *Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 297 [17 Cal.Rptr.3d 26].)

---

Energy Corporation. From these calculations, Pressler concluded Borghese's share of the lost profits would be $3.909 million and Harwood's share of the lost profits would be $11.909 million.

[4] The compensatory damages awarded against Silverman too must represent Sole Energy Corporation's lost profits. As we explain below: (1) the jury found Silverman liable to Borghese and Swaney in an amount that was about 10 percent of lost profit damages imposed against Petrominerals, and (2) other than lost profits, Borghese and Swaney advanced no other theory or evidence of damages against Petrominerals or Silverman.

[5] Plaintiffs argue that the joint respondents' brief filed by Petrominerals and Silverman violates California Rules of Court, rule 14, by failing to include record citations for several factual assertions and by failing to cite legal authority to support several arguments. None of the factual assertions and arguments claimed to be unsupported affects our decision.

■ Shareholders do not own and have no right to receive corporate profits, except in limited circumstances: "It is fundamental, of course, that the corporation has a personality distinct from that of its shareholders, and that the latter neither own the corporate property nor the corporate earnings." (*Miller v. McColgan* (1941) 17 Cal.2d 432, 436 [110 P.2d 419].) Shareholders own stock in the corporation, from which they derive income only upon liquidation of the corporation or the declaration of a dividend by the corporate directors. (*Ibid.*)

*Nelson, supra,* 72 Cal.App.4th 111, illustrates and explains those principles. In that case, Nelson formed a corporation with Anderson to market a line of skin care products. (*Id.* at p. 117.) Nelson and Anderson were the only two shareholders of the corporation, and both served as officers. (*Ibid.*) The corporation made few sales and failed. Nelson sued Anderson for various torts, including interference with contractual relations and prospective economic advantage, alleging Anderson made bad decisions and refused to assist in marketing the company's products. At trial, Nelson's proof of damages included her proportionate share of the corporation's lost profits. (*Id.* at p. 126.) The jury awarded Nelson $565,000 in damages. (*Id.* at p. 122.)

■ The Court of Appeal reversed, concluding Nelson's claims should have been pleaded as corporate derivative claims. (*Nelson, supra,* 72 Cal.App.4th at p. 127.) The court explained the difference between an individual cause of action and a derivative cause of action: "[A]n individual cause of action exists only if the damages were not *incidental* to an injury to the corporation. [Citation.] The cause of action is individual, not derivative, only ' "where it appears that the injury resulted from the violation of some special duty owed the stockholder by the wrongdoer and having its origin in circumstances independent of the plaintiff's status as a shareholder." ' [Citation.] [¶] In other words, it is the gravamen of the wrong alleged in the pleadings, not simply the resulting injury, which determines whether an individual action lies." (*Id.* at p. 124.) "Because all of the acts alleged to have caused Nelson's injury amount to alleged misfeasance or negligence in managing the corporation's business, causing the business to be a total failure, any obligations so violated were duties owed directly and immediately to the corporation. [Citation.] Because the gravamen of the complaint is injury to the whole body of its stockholders, it was for the corporation to institute and maintain a remedial action. [Citation.] A derivative action would have been appropriate if its responsible officials had refused or failed to act. [Citations.]" (*Id.* at pp. 125–126.)

■ The appellate court reasoned that Nelson, as a shareholder, had no ownership interest in the corporation's profits or assets and therefore could not have been deprived of them. (*Nelson, supra,* 72 Cal.App.4th at p. 126.)

"The nature of Nelson's proof establishes that any injury was to the corporation; and since she neither alleged nor proved the breach of a duty owing to her personally, her emotional distress and the loss of her investment were incidental to the injury to the corporation." (*Ibid.*) The *Nelson* court held the loss of corporate profits, revenues, or assets as a result of negligent or intentional wrongdoing by a corporation's officers, directors, or majority shareholders results in corporate injury, for which only the corporation may sue to recover. (*Ibid.*)

In *Sutter, supra,* 28 Cal.2d 525, the plaintiff asserted a claim for damages resulting from a fraud committed directly on the plaintiff before the corporation's inception. The California Supreme Court held the plaintiff's lost investment in the corporation was both an individual and a derivative loss. (*Id.* at p. 531.) The defendants in *Sutter* owned an oil and gas lease and had constructed an offshore steel island and derrick on the leased property. (*Id.* at pp. 526–527.) The defendants knew Sutter was interested in developing the site and misrepresented to him that the steel island had been constructed soundly. (*Id.* at p. 527.) In reliance on the misrepresentations, Sutter formed a development corporation to purchase the steel island and the derricks, rent the equipment on the steel island, and assume the defendants' lease. (*Id.* at pp. 527–528.) Sutter invested nearly $34,000 and expended significant time and effort in the venture, for which he intended to be compensated from the development corporation's profits. (*Id.* at pp. 528–529.)

The venture failed because the steel island collapsed and because the defendants could not obtain a lease assignment, refused to supply their expert assistance, and refused to rent the drilling equipment. (*Sutter, supra,* 28 Cal.2d at p. 528.) Sutter, as an individual, sued the defendants and sought as damages the money he had invested in the venture as well as lost wages in the amount of $18,000. (*Id.* at pp. 528–529.) At the close of Sutter's evidence, the trial court entered a judgment of dismissal on the ground Sutter's claims were derivative claims of the development corporation. (*Id.* at p. 526.)

The Supreme Court reversed, concluding Sutter's claims arising out of the defendants' fraud were both derivative and individual because the false promises ran both to Sutter and to the development corporation. (*Id.* at p. 531.) "In the instant case the essence of plaintiff Sutter's charge is that by reason of the fraudulent representations of defendants, he was induced to do several things, namely, abandon his own oil development projects, devote his time to the project whereby the steel island and other facilities would be used and *to form and invest in a corporation* (the Development Company) to carry on the new oil production project. . . . The fraud was committed by *defendants, and plaintiff Sutter took steps in reliance upon the misrepresentations including the formation of the Development Company before that*

*company was formed.* The tort was completed except as to the injury suffered. . . . Defendants, by their promises and representations induced plaintiff to form the corporation and invest his money therein, and then breached their duty of honest dealing with him." (*Sutter, supra,* 28 Cal.2d at pp. 530–531.)

The nature of the damages Sutter could recover for the fraud perpetrated on him individually was significant to the *Sutter* court's conclusion: "By way of damages plaintiff Sutter asserts that because of the false representations he invested $33,440 in the venture and the Rincon Company, and that as the result of the fraud of defendants the stock in the Rincon Company became valueless. [¶] While ordinarily a stockholder may not sue individually for impairment of a corporation's assets rendering the stock worthless, yet here that result is merely one method of ascertaining the amount of damages suffered by Sutter. He lost his investment which was represented by the stock, and its reduction in value would be the extent of his loss. The damages all flowed from the tort of defendants." (*Sutter, supra,* 28 Cal.2d at p 531.) In addition, the court held Sutter could recover the reasonable value of his services and time expended, even though he intended to be paid out of the development corporation's profits, because those losses were proximately caused by the fraud. (*Id.* at pp. 534–535.)

In *Nathanson, supra,* 132 Cal.App.2d 363, 365, Nathanson approached Murphy about buying her ranch. Murphy told Nathanson the ranch was 960 acres in size. (*Ibid.*) In reliance on that representation, Nathanson formed a corporation to buy the ranch and paid Murphy $5,000 out of his own pocket as a down payment. (*Id.* at pp. 365–366.) While the corporation solicited sales of its stock, it discovered the ranch had only 757 acres. (*Id.* at p. 366.) The corporation could not sell its stock, negotiations to reduce the purchase price were unsuccessful, and the deed of trust used to secure the balance of the purchase price was foreclosed. (*Ibid.*) Nathanson individually sued Murphy for various damages arising out of the misrepresentation. (*Ibid.*)

The trial court awarded the plaintiff (Nathanson's estate) $5,000 in damages, representing the amount Nathanson, on behalf of the corporation, had paid as the down payment on the ranch. (*Nathanson, supra,* 132 Cal.App.2d at pp. 364, 370–371.) The Court of Appeal affirmed. Describing *Sutter* as similar, the court held the plaintiff could recover damages because the misrepresentation was made directly to Nathanson, before the corporation was formed, to induce him to make the $5,000 down payment. (*Nathanson, supra,* 132 Cal.App.2d at p. 370.) Although Nathanson made the down payment on behalf of the corporation formed to acquire the ranch, Nathanson could sue for individual recovery because the down payment constituted an investment in the corporation and Nathanson was injured when he lost that investment as a consequence of Murphy's fraud. (*Id.* at pp. 370–372.)

Unlike *Nelson,* this case does not involve tortious conduct occurring after the corporation was fully formed and while the corporation was operating.[6] Rather, as in *Sutter* and *Nathanson,* Plaintiffs in this case contend they were injured by wrongs directed to them individually and occurring before Sole Energy Corporation was formed. *Sutter* and *Nathanson* upheld recovery of the amount of the plaintiffs' respective lost investments because in each case the plaintiff individually suffered injury as the proximate result of the defendants' tortious conduct. Those injuries included loss of investment in the later-formed corporation. But neither *Sutter* nor *Nathanson* addresses the issue presented here: Whether the putative shareholders can recover their proportionate shares of the corporation's future lost profits.

■ We conclude Borghese and Swaney, as putative shareholders of Sole Energy Corporation, could not recover their proportionate shares of the corporation's lost profits. Neither *Sutter* nor *Nathanson* alters the long-established proposition that a shareholder does not have an ownership interest in corporate profits. *Sutter* and *Nathanson* are reconcilable with *Nelson,* for a shareholder's out-of-pocket investment in the corporation is not the same as lost future corporate profits. Because corporate profits belong to the corporation, and not to its shareholders individually, lost profits are an " 'injury to the corporation, or to the whole body of its stock' " (*Jones v. H. F. Ahmanson & Co., supra,* 1 Cal.3d at p. 106) and therefore are derivative in nature. When corporate lost profits are sought as damages, the gravamen of the complaint is injury to the corporation, not injury to an individual shareholder. Pressler's opinion of damages was based on the premise the profits earned by the acquiring corporation—Sole Energy Corporation—would have been about $80 million over 15 years. Thus, the gravamen of the injury asserted—lost profits—was derivative and could not be recovered by Borghese and Swaney individually.

■ *Sutter* based its conclusion on the proposition a shareholder may recover damages for injuries the shareholder individually suffered as a proximate result of tortious conduct directed to the shareholder. As applied to this case, such a causation analysis confirms our conclusion that Swaney and Borghese cannot recover Sole Energy Corporation's purported future lost profits. The measure of damages for intentional interference with contractual relations or prospective economic advantage is "an amount that will reasonably compensate plaintiff for all loss or harm, providing that you find it was [or will be] suffered by plaintiff and caused by the defendant's conduct." (BAJI No. 7.89; see also *Youst v. Longo* (1987) 43 Cal.3d 64, 71, fn. 6 [233

---

[6] Plaintiffs argue *Nelson* is distinguishable because that case involved a claim of malfeasance against a person who was a corporate officer, director, and majority shareholder. The principle that a shareholder may not recover individually for injury to the corporation applies equally to claims against third persons. (*Sutter, supra,* 28 Cal.2d at p. 530.)

Cal.Rptr. 294, 729 P.2d 728] [damages for interference with prospective economic advantage are "economic harm to the plaintiff proximately caused by the acts of the defendant"].) The amount of such harm or loss includes "[t]he financial loss of the benefits of the [contract] [or] [the prospective economic relationship]."[7] (BAJI No. 7.89.)

What would have been Borghese's and Swaney's benefits from the contract or the prospective economic relationship with HBOC? The benefit Borghese and Swaney (via Harwood) would have received from the transaction was ownership of shares of Sole Energy Corporation. Under the terms of the letter of intent, the oral contract, and various drafts of the purchase agreement, Sole Energy Corporation was to be the party to the contract to purchase HBOC's stock and oil- and gas-related assets. Borghese and Harwood were to be shareholders of Sole Energy Corporation. As shareholders, Borghese and Harwood would have had no right to receive those corporate profits. (*Miller v. McColgan, supra,* 17 Cal.2d at p. 436.) Accordingly, the benefits gained by Borghese and Swaney from the transaction would have been the value of their shares in Sole Energy Corporation, not Sole Energy Corporation's profits.

Under *Sutter* and *Nathanson,* Swaney and Borghese might have been able to recover the loss in value of their shares or diminution of their ownership interest in Sole Energy Corporation, but only if such losses were not part of an injury to the " 'whole body' " of the corporation's stock (*Jones v. H. F. Ahmanson, supra,* 1 Cal.3d at pp. 106–107) or "merely incidental to" the alleged harm suffered by the corporation and all of its shareholders (*Avikian v. WTC Financial Corp.* (2002) 98 Cal.App.4th 1108, 1115–1116 [120 Cal.Rptr.2d 243]; see also *PacLink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 965–966 [109 Cal.Rptr.2d 436]). Regardless, the diminution in value of Borghese's and Swaney's shares in Sole Energy Corporation was not the same as Sole Energy Corporation's purported lost profits. No evidence was presented of lost share value or loss in value of Borghese's and Swaney's ownership interest in Sole Energy Corporation. Pressler testified only as to Sole Energy Corporation's lost profits, a corporate loss.

---

[7] BAJI No. 7.89 is derived from the Restatement Second of Torts, section 774A, which states, in relevant part: "(1) One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for [¶] (a) the pecuniary loss of the benefits of the contract or the prospective relation; [¶] (b) consequential losses for which the interference is a legal cause; and [¶] (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." (See *Di Loreto v. Shumake* (1995) 38 Cal.App.4th 35, 38–39 [45 Cal.Rptr.2d 22].) The Restatement Second of Torts recognizes a proper plaintiff may recover lost profits when a third person is prevented from performing a contract with that plaintiff and, on a claim for interference with prospective economic advantage, may recover the lost profits to have been made out of the expected contracts. (Rest.2d Torts, § 774A, com. b, p. 55.)

Swaney and Borghese arguably lost their out-of-pocket expenses and the salaries they would have earned as officers of Sole Energy Corporation. The jury did not award Swaney and Borghese such damages but awarded Swaney and Borghese the same amounts as Pressler opined were the amounts of their supposed lost profits.

Plaintiffs argue the principle that lost corporate profits belong to the corporation does not apply here because the acquiring corporation, Sole Energy Corporation, never issued stock and never went into operation. This point is irrelevant under Plaintiffs' theory of recovery, which was based on the premise Sole Energy Corporation would (or did) issue stock and would function as a corporation for its intended purpose. Pressler based his opinion of lost profits on those premises. If Sole Energy Corporation never issued stock and never went into operation, then Sole Energy Corporation never had lost profits and it never had shareholders to sue—individually or derivatively—for their recovery.

Plaintiffs, relying on *Elsbach v. Mulligan* (1943) 58 Cal.App.2d 354 [136 P.2d 651] (*Elsbach*), argue that barring Borghese and Swaney from individually recovering Sole Energy Corporation's lost profits would be unjust. Petrominerals and Silverman urge us to ignore that argument, along with several others, because Plaintiffs first made those arguments in their reply brief in this appeal. (E.g., *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [60 Cal.Rptr.2d 770].) We exercise our discretion to consider the arguments, but conclude they have no merit.

*Elsbach, supra,* 58 Cal.App.2d 354, does not address whether shareholders may personally recover a corporation's lost profits. In *Elsbach*, Elsbach and Mulligan formed a joint venture, later incorporated, to import and sell alcoholic beverages by creating exclusive agencies with producers. (*Id.* at p. 358.) The corporation was formed and issued shares of stock. (*Id.* at p. 359.) Mulligan made false representations to two producers to induce them to give him personally exclusive agencies intended for the corporation. (*Id.* at pp. 359–361.) Elsbach, in his personal capacity, sued Mulligan in tort and recovered damages. (*Id.* at pp. 356, 366.) The Court of Appeal, affirming, concluded the evidence supported the findings the corporation was in reality a joint venture and Elsbach and Mulligan acted throughout as joint venturers. (*Id.* at pp. 368–369.) Because one joint venturer may recover damages from another for breach of fiduciary duties, the Court of Appeal rejected the argument the action should have been brought by the corporation (*id.* at pp. 368–370) and held Elsbach personally could recover damages from Mulligan (*id.* at pp. 369–370).

*Elsbach* does not support Borghese's and Swaney's recovery of Sole Energy Corporation's lost profits. Borghese and Swaney did not act as joint venturers with Petrominerals or Silverman and did not sue them as joint venturers.

■ Plaintiffs argue in their reply brief that assertions Petrominerals and Silverman made in support of their motion for summary judgment against Sole Energy Corporation judicially estop Petrominerals and Silverman from asserting only Sole Energy Corporation may recover lost profits. " 'Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.' " (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 [70 Cal.Rptr.2d 96].) The doctrine applies when: (1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (the court adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake. (*Id.* at p. 183.)

In granting Defendants' motion for summary judgment against Sole Energy Corporation, the trial court accepted Defendants' assertions that (1) each cause of action asserted in Sole Energy Corporation's verified complaint was premised on the allegation Sole Energy Corporation entered into the letter of intent; (2) Sole Energy Company, LLC, not Sole Energy Corporation, entered into the letter of intent; (3) Sole Energy Corporation was formed on December 30, 1999, after the letter of intent was signed; (4) Sole Energy Corporation was not acting as a de facto corporation as of the date the letter of intent was signed; (5) Sole Energy Company, LLC, never assigned its rights under the letter of intent, and Sole Energy Corporation never succeeded to those interests; and (6) Sole Energy Corporation had no power to enter into the letter of intent, making the letter void from its inception.

Petrominerals and Silverman's assertions in this appeal regarding Sole Energy Corporation's standing are not *totally* inconsistent with the assertions made in support of the summary judgment motion. At trial, Plaintiffs proceeded on the theory an oral contract had been formed for Sole Energy Corporation to purchase HBOC's stock. The oral contract was formed after the letter of intent was signed and after the date of Sole Energy Corporation's incorporation. Draft agreements show Sole Energy Corporation as the purchasing entity. Plaintiffs also asserted Sole Energy Partnership assigned whatever rights it had to Sole Energy Corporation. Neither the oral contract nor an assignment from Sole Energy Partnership was the subject of Defendants' summary judgment motion, and the order granting summary judgment did not resolve the issue of Sole Energy Corporation's standing to recover under the oral contract theory.

In *Sole Energy I, supra,* 128 Cal.App.4th 187, we affirmed the trial court's order deeming Sole Energy Corporation's motion for reconsideration of the summary judgment to be a motion for a new trial and granting it. In the opinion, we state, "[w]hether the trial court was correct with respect to Sole Energy Corporation's standing is not an issue before us on this appeal." (*Id.* at p. 197.) The summary judgment against Sole Energy Corporation was effectively vacated by the order granting a new trial. The matter of Sole Energy Corporation's standing under the letter of intent therefore remains an open issue on remand.

Finally, Plaintiffs argue that in granting JNOV motion 2, the trial court erred by resolving two ambiguities against them. First, Plaintiffs assert the trial court resolved a purported ambiguity in the jury verdict by concluding they had assigned their rights against Defendants to Sole Energy Corporation. The verdict is unambiguous. Further, whether such an assignment occurred is irrelevant. As putative shareholders in Sole Energy Corporation, Borghese and Swaney had no right to the corporate profits, and their lost financial benefit caused by the alleged interference could not have been lost corporate profits.

Second, Plaintiffs assert Pressler's testimony could be construed as referring either to Sole Energy Corporation's lost profits or to Sole Energy Partnership's lost profits. The trial court erred, Plaintiffs argue, by resolving this ambiguity to conclude Pressler testified only as to the corporation's lost profits. We find no ambiguity in Pressler's testimony. Pressler quite clearly testified to Sole Energy Corporation's lost profits only. He calculated damages based on Borghese's and Harwood's respective percentages of stock holdings in Sole Energy Corporation and not on ownership interest in any other entity. Further, Borghese testified Sole Energy Partnership is not a formal partnership, but an informal association by which he, Swaney, and Harwood conducted business.

> B. *Grant of JNOV Motion 3 Affirmed: Swaney and Harwood Individually Cannot Recover Future Corporate Lost Profits As Damages.*

The jury awarded Swaney $11.909 million in compensatory damages against Petrominerals and $1.2 million in compensatory damages against Silverman. In JNOV motion 3, Petrominerals and Silverman requested judgment in their favor against Swaney on the ground Swaney's subchapter S corporation, not Swaney, was a putative shareholder of Sole Energy Corporation. The trial court granted JNOV motion 3, stating "it appears that the award of lost-profit damages to Swaney, the individual, rather than . . . the corporate S is improper."

Because neither Swaney nor Harwood, as a putative shareholder of Sole Energy Corporation, can recover its future lost profits as damages, we need only address JNOV motion 3 in one respect. Pressler testified that Harwood's proportionate share of lost profits would have been $11.909 million. That testimony accounts for the verdict against Petrominerals, but not the verdict of $1.2 million in compensatory damages against Silverman and in favor of Swaney. Neither side addresses the source of those compensatory damages against Silverman.

It appears to us the $1.2 million awarded in Swaney's favor against Silverman represents 10 percent of the $11.909 million awarded in Swaney's favor against Petrominerals for lost profits. The evidence Swaney presented of compensatory damages was: (1) Pressler's lost profits testimony, (2) Swaney's testimony of $336,000 for lost salary, and (3) $189,416.29 in out-of-pocket expenses for Harwood (which the jury awarded to Harwood). While the $1.2 million in compensatory damages awarded to Swaney against Silverman is far greater than the amount Swaney claimed for lost salary, the damages do equal about 10 percent of the $11.909 million awarded for lost profits. The $1.2 million in compensatory damages awarded against Silverman must, therefore, fall with the lost profits damages.

> C. *Grant of JNOV Motions 1 and 6 on the Cause of Action*
> *for Interference with Contractual Relations Affirmed:*
> *Plaintiffs Failed to Produce Evidence That Silverman*
> *Interfered with a Contract.*

In JNOV motion 1, Silverman argued Plaintiffs could not recover for interference with contractual relations or interference with prospective economic advantage because they failed to present evidence that Silverman engaged in conduct that was wrongful apart from the interference itself. In JNOV motion 6, Silverman argued Plaintiffs could not recover under those causes of action because they failed to present evidence he engaged in conduct that interfered with any contractual relations or prospective economic advantage.

Plaintiffs appeal the trial court's grant of JNOV motions 1 and 6 on the interference with contractual relations cause of action. Silverman appeals the trial court's denial of JNOV motions 1 and 6 on the interference with prospective economic advantage cause of action. Silverman's appeal is addressed in part II.A.

The elements of a cause of action for interference with contractual relations are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) the defendant's

intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damages. (*PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 595 [52 Cal.Rptr.2d 877].) Proof the interfering conduct was wrongful, independent from the interference itself, is not required to recover for interference with contractual relations. (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 343 [60 Cal.Rptr.2d 539].)

Plaintiffs' theory at trial was that an oral contract was formed during Swaney's telephone conversation with Hodges on February 22, 2000. The contract terminated on February 25, 2000, when Nevadacor and Kaymor informed Sole Energy Corporation in writing "they wish[ed] to terminate the negotiations and the Letter of Intent dated December 16, 1999."

The record reveals no evidence that Silverman engaged in any conduct to interfere with this oral contract during its brief four-day life. Evidence of Silverman's conduct before the oral contract was formed is irrelevant to the claim for interference with contractual relations, which requires the existence of a valid contract. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587].) Hodge's conduct, though relevant perhaps to Petrominerals' liability, is irrelevant to Silverman's liability for interference with contractual relations. Thus, the order granting JNOV motions 1 and 6 on the interference with contractual relations cause of action is affirmed.

### D. Grant of JNOV Motion 7 Affirmed: Plaintiffs Cannot Recover Punitive Damages Without an Award of Actual Damages.

The jury awarded Borghese and Swaney each $1.5 million in punitive damages against Petrominerals and $5,000 each in punitive damages against Silverman. The trial court granted JNOV motion 7 and struck the jury's award of punitive damages against Silverman on the ground the evidence did not support imposition of punitive damages against him. Petrominerals, though not a party to JNOV motion 7, argues neither Borghese nor Swaney may recover punitive damages from it because the compensatory damages must be reversed.

An award of actual damages, even if nominal, is required to recover punitive damages. (Civ. Code, § 3294; *Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 147 [279 Cal.Rptr. 318, 806 P.2d 1353] ["actual damages are an absolute predicate for an award of exemplary or punitive damages"]; *Mother Cobb's Chicken T., Inc. v. Fox* (1937) 10 Cal.2d 203, 205 [73 P.2d 1185]; *Jackson v. Johnson* (1992) 5 Cal.App.4th 1350, 1358 [7 Cal.Rptr.2d 482].)

Neither Borghese nor Swaney can recover actual damages from Petrominerals or Silverman and, therefore, neither Borghese nor Swaney can recover punitive damages. We affirm the order granting JNOV motion 7 and remand with directions to strike the punitive damages against Petrominerals.

E. *Grant of Petrominerals' Motion for a New Trial: The Court Lacks Jurisdiction Because Plaintiffs Failed to Appeal from the Order Granting a New Trial.*

We lack jurisdiction to consider Plaintiffs' challenge to the order granting Petrominerals' motion for a new trial because Plaintiffs failed to appeal from that order.

An order granting a motion for a new trial is an appealable order. (Code Civ. Proc., § 904.1, subd. (a)(4).) If an order is appealable, an aggrieved party must file a timely notice of appeal from the order to obtain appellate review. (*Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 46 [269 Cal.Rptr. 228].) A notice of appeal from a judgment alone does not encompass other judgments and separately appealable orders: " 'The law of this state does not allow, on an appeal from a judgment, a review of any decision or order from which an appeal might previously have been taken.' " (*In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 119 [49 Cal.Rptr.2d 339].)

The notice of appeal is sufficient "if it identifies the particular judgment or order being appealed." (Cal. Rules of Court, rule 1(a)(2).) " '[W]here several judgments and/or orders occurring close in time are separately appealable (e.g., judgment and order awarding attorney fees), each appealable judgment and order must be expressly specified—in either a single notice of appeal or multiple notices of appeal—in order to be reviewable on appeal.' " (*DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, 43 [99 Cal.Rptr.2d 366], quoting Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1998) ¶ 3:119.1, p. 3-34 (rev. # 1, 1997), italics omitted.)

In the notice of appeal filed February 19, 2003, Plaintiffs stated they were appealing "from the Judgment entered on January 30, 2003 in Department C-13 of the above-entitled court." The notice of appeal does not mention the order granting Petrominerals a new trial, entered on January 17, 2003, or the notice of entry of the new trial order, served on the same day. The notice of appeal neither specifies the new trial order nor makes it " 'reasonably clear' " Plaintiffs were trying to appeal from it. (*D'Avola v. Anderson* (1996) 47 Cal.App.4th 358, 361 [54 Cal.Rptr.2d 689].) Although notices of appeal must be liberally construed (Cal. Rules of Court, rule 1(a)(2)), we cannot liberally construe the February 19, 2003 notice of appeal to include the new trial order, which was directly and independently appealable.

 Plaintiffs suggest they did not have to file a notice of appeal to challenge the new trial order because it is void on the ground the trial court failed to timely file a signed specification of reasons pursuant to Code of Civil Procedure section 657. However, "a failure to specify reasons is not, as such, a jurisdictional defect. By *omitting to act* in that connection a court does not render its new trial order void, it merely restricts the scope of appellate review to the other grounds, if any, listed in the motion [for a new trial]." (*Mercer v. Perez* (1968) 68 Cal.2d 104, 121 [65 Cal.Rptr. 315, 436 P.2d 315].)

 The recent decision in *Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15 [23 Cal.Rptr.3d 490, 104 P.3d 844] does not support construing the notice of appeal to confer jurisdiction over the order granting Petrominerals a new trial. In that case, the Supreme Court held "a reviewing court should construe a notice of appeal from an order *denying* a new trial to be an appeal from the underlying judgment when it is reasonably clear the appellant intended to appeal from the judgment and the respondent would not be misled or prejudiced." (*Id.* at p. 22, fn. omitted, italics added.) An order denying a motion for a new trial is nonappealable and must be reviewed on appeal from the underlying judgment. (*Id.* at p. 18.) In contrast, an order granting a new trial *is* appealable. (Code Civ. Proc., § 904.1, subd. (a)(4).) A notice of appeal mentioning only the underlying judgment would not make it reasonably clear the appellant also intended to appeal from a separate and directly appealable order granting a new trial.

Because Plaintiffs did not appeal from the order granting Petrominerals a new trial, we have no jurisdiction to review that order. (Code Civ. Proc., § 906; see also *Norman I. Krug Real Estate Investments, Inc. v. Praszker, supra,* 220 Cal.App.3d at p. 46.)

### F. *Plaintiffs Do Not Challenge the Order Granting a Nonsuit on the Fraud and Conspiracy Claims Against Silverman.*

The trial court granted a nonsuit on the fraud and conspiracy claims against Silverman. The nonsuit was reviewable on appeal from the final judgment because the order granting nonsuit was not in writing, signed by the court, and filed. (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 448, fn. 1 [105 Cal.Rptr.2d 856].) Plaintiffs do not challenge the nonsuit in their briefs on appeal and therefore have waived any claim of error. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 964 [135 Cal.Rptr.2d 505].)

## II. APPEAL OF PETROMINERALS AND SILVERMAN

### A. Denial of JNOV Motions 1 and 6 on Interference with Prospective Economic Advantage Cause of Action Reversed: Plaintiffs Failed to Produce Evidence Silverman Interfered with an Existing Economic Relationship or Engaged in Conduct Wrongful Apart from the Interference Itself.

As stated above, the trial court denied Silverman's JNOV motions 1 and 6 on the cause of action for interference with prospective economic advantage. The elements of a cause of action for interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional and wrongful conduct designed to interfere with or disrupt this relationship; (4) interference with or disruption of this relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful conduct. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153–1154 [131 Cal.Rptr.2d 29, 63 P.3d 937].)

To establish intentional interference with prospective economic advantage, a plaintiff must plead and prove the defendant "engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393 [45 Cal.Rptr.2d 436, 902 P.2d 740].) An act is independently wrongful "if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Korea Supply Co. v. Lockheed Martin Corp., supra,* 29 Cal.4th at p. 1159.)

In *Korea Supply Co. v. Lockheed Martin Corp., supra,* 29 Cal.4th at page 1159, the California Supreme Court concluded the plaintiff had pleaded independent wrongfulness by alleging the defendant engaged in bribery and offered sexual favors to obtain a contract from the Korean government, which acts violated the Foreign Corrupt Practices Act, 15 United States Code section 78dd et seq. In *Reeves v. Hanlon* (2004) 33 Cal.4th 1140 [17 Cal.Rptr.3d 289, 95 P.3d 513], it was undisputed the defendants engaged in unlawful and unethical conduct in disrupting the plaintiffs' relationships with key at-will employees by, among other things, destroying computer records, misappropriating confidential information, and improperly soliciting clients.

In this case, the parties disagree over the time frame to use in analyzing Silverman's conduct. Silverman argues the relevant time frame is February 22 through 25, 2000, the period between the formation and termination of the oral contract. Silverman argues his conduct before February 22 is irrelevant because any attempt to interfere with Plaintiffs' prospective economic relationship with HBOC, Nevadacor, or Kaymor was unsuccessful in preventing the creation of a binding oral contract. Plaintiffs argue for a broader time frame: "Plaintiffs' cause of action for intentional interference with prospective economic advantage is based upon the economic relationship established on December 16, 1999, by the letter of intent between plaintiffs and HBOC, et. al. Thus, any disrupting conduct that occurred after this relationship was established should be relevant to this tort." Plaintiffs also argue the relevant time frame should extend back to July 20, 1999, when Hodges first represented to Borghese and Swaney that Petrominerals could not purchase HBOC.

Under any proposed time frame, the evidence, viewed in the light most favorable to Plaintiffs, does not support the verdict based on interference with prospective economic advantage. As explained above, the record does not reveal any interfering conduct by Silverman from February 22 through February 25, 2000, the brief life span of the oral contract. According to the record, the only thing Silverman did between December 16, 1999 and February 22, 2000 was to congratulate Swaney at a trade show on February 3, 2000 for obtaining financing. Such conduct was neither interfering nor wrongful.

One has to go back to August 1999 to find evidence in the record of any other conduct by Silverman relating to the purchase of HBOC's stock and oil- and gas- related assets. On August 11, 1999, Silverman faxed a letter to Hodges stating Petrominerals might be able to purchase HBOC. The letter concluded, "Let's talk more maybe next week after we smoke out Harwood and Rich[] [Borghese's] abilities." On August 24, 1999, Hodges faxed Silverman a counterproposal for Petrominerals' purchase of HBOC. The letter stated an entity called Sole Energy Company would receive a stock option as "compensation for putting the deal together." Silverman did not engage in wrongful conduct by making or participating in those communications because neither was "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Korea Supply Co. v. Lockheed Martin Corp., supra,* 29 Cal.4th at p. 1159.) Plaintiffs cite no authority establishing Silverman had a legal duty to disclose Hodges's August 24 letter to Borghese or Swaney.

On August 12, 1999, Silverman misrepresented to Borghese that (1) Petrominerals could not purchase HBOC due to a conflict of interest and (2) Silverman had no knowledge that Petrominerals was interested in acquiring HBOC. At the same time, Silverman failed to inform Borghese about a potential joint venture between Petrominerals and HBOC.

 Assuming those misrepresentations and that omission were wrongful, they nonetheless do not support liability for interference with prospective economic advantage. To recover for interference with prospective economic advantage, the plaintiff must prove "the existence of an economic relationship with some third party that contains the probability of future economic benefit to the plaintiff." (*Korea Supply Co. v. Lockheed Martin Corp., supra,* 29 Cal.4th at p. 1164.) The tort protects the expectation the relationship will produce the desired benefit, not " 'the more speculative expectation that a potentially beneficial relationship will arise.' " (*Ibid.*) "Only plaintiffs that can demonstrate an economic relationship with a probable future economic benefit will be able to state a cause of action for this tort." (*Ibid.*)

As of August 12, 1999, none of the Plaintiffs in this case had an existing economic relationship with HBOC, Nevadacor, or Kaymor, much less an existing relationship containing the *probability* of a future economic benefit. Discussions about the possibility of purchasing HBOC's stock had just begun in earnest. The letter of intent—which Plaintiffs contend was the basis for their interference with economic relationship cause of action—would not be written until three months later. Further, under Plaintiffs' theory, Silverman made the misrepresentations to induce Plaintiffs into *seeking* an economic relationship with HBOC, Nevadacor, and Kaymor—not to *disrupt* an existing economic relationship.

Plaintiffs argue the acts constituting interference with the oral contract suffice as the necessary wrongful conduct for interference with prospective economic advantage. But, as explained above, Silverman did not engage in any conduct to interfere with the short-lived oral contract.

The evidence, construed favorably to Plaintiffs and drawing all inferences in their favor, established Silverman did not engage in any wrongful conduct that interfered with a prospective economic relationship containing the probability of future economic benefit. We therefore reverse the order denying JNOV motions 1 and 6 on the interference with prospective economic advantage cause of action.

## B. *Denial of JNOV Motion 4 Reversed: Plaintiffs Presented No Evidence Sole Energy Partnership Suffered Damages.*

In JNOV motion 4, Petrominerals and Silverman argued no evidence was presented that Sole Energy Partnership sustained damages. We agree. In fact, at least twice during trial, Plaintiffs' counsel conceded Plaintiffs had presented no evidence of damages sustained by Sole Energy Partnership. In response to a motion for nonsuit on that ground, counsel stated, "[y]our honor, I will concede to the court that I did not affirmatively put on damages involving Sole Energy [Partnership]." In closing argument, Plaintiffs' counsel argued: "Finally, Sole Energy [Partnership], which is basically the group that signed the letter of intent. We have not actively put on any damages for them. But if you don't think these folks are damaged in some way, then Sole Energy [Partnership] clearly is damaged. It's a technicality. We put them up just to make sure we covered all our bases here."

Plaintiffs argue Pressler's testimony established Sole Energy Partnership sustained damages in the amount of lost working capital. Pressler testified that Petrominerals' letter of intent to purchase HBOC's stock required Petrominerals to have $250,000 in working capital when the transaction closed and that "the Sole deal" contained an identical provision. It is unclear from this testimony whether Pressler meant Sole Energy Partnership had to have $250,000 in working capital or had to pay that amount to create Sole Energy Corporation's working capital. Regardless, neither Pressler nor anybody else testified whether the $250,000 in working capital was actually paid into Sole Energy Corporation or Sole Energy Partnership and, if so, whether that money was lost because the stock and asset purchase was never consummated.

### DISPOSITION

We affirm the grant of JNOV motions 2, 3, and 7, affirm the grant of JNOV motions 1 and 6 on the interference with contractual relations cause of action, reverse the denial of JNOV motion 4, and reverse the denial of JNOV motions 1 and 6 on the interference with prospective economic advantage cause of action. We remand with directions to the trial court to strike the punitive damages awarded against Petrominerals. These rulings eliminate all damages, compensatory and punitive, awarded Borghese, Swaney, and Sole Energy Partnership, and eliminate the $19,000 in damages awarded to

Harwood against Silverman. As a result, the only portion of the verdict remaining is the damages awarded Harwood against Petrominerals. The trial court granted Petrominerals's motion for a new trial, and Harwood failed to appeal from the order granting a new trial. Accordingly, on remand, Harwood's claims against Petrominerals are subject to a new trial.

Respondents Petrominerals and Silverman to recover costs on appeal.

Sills, P. J., and Aronson, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied July 20, 2005. George, C. J., and Baxter, J., did not participate therein.