Filed 11/13/15; second of two modifications—first modif. and partial pub. order and unmodified opinion attached

**CERTIFIED FOR PARTIAL PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re A.O., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E062111 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ1300355) |
| v. | ORDER MODIFYING OPINION AND GRANTING PARTIAL PUBLICATION |
| M.O., | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

IT IS ORDERED that the opinion filed in this matter on October 14, 2015 is modified as follows:

Delete the first sentence in the second paragraph on page 21 of Part II.1. reading,

Rule 5.590(a) states that "after making its disposition order," the court "*must advise, orally or in writing,*" the child, parent, or guardian of his or her right to appeal from the court order. (Italics added.)

It shall be replaced with the following sentence:

1

Rule 5.590(a) states that "after making its disposition order," the court "*must* advise, orally or in writing, the child, if of sufficient age, and, if present, the parent or guardian of . . . [t]he right of the child, parent, and guardian to appeal from the court order. . . ."  (Italics added.)

IT IS FURTHER ORDERED that certification of the opinion for nonpublication dated October 14, 2015 is hereby vacated and set aside.  On pages 1 and 40 of the opinion, the words NOT TO BE PUBLISHED IN OFFICIAL REPORTS are replaced with the words CERTIFIED FOR PARTIAL PUBLICATION and those words on page 1 are followed by insertion of the following footnote:

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II.2, II.3, and II.4.

IT IS FURTHER ORDERED that the request for publication of the opinion filed on October 14, 2015 is GRANTED with the exception of parts I, II.2, II.3, and II.4.  The opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c).

Except for these modifications, the opinion remains unchanged.  These modifications do not effect a change in judgment.

CERTIFIED FOR PARTIAL PUBLICATION


CODRINGTON            
                                                                                                    J.

I concur:


MILLER            
                    J.

Filed 10/14/15; part. pub. & mod. order 11/12/15 (see end of opn.)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.O., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E062111 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ1300355) |
| v. | OPINION |
| M.O., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Lawrence P. Best, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed in part; reversed in part with directions.

Linda B. Puertas, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Gregory P. Priamos, County Counsel, James E. Brown, Guy B. Pittman, and Anna M. Marchand, Deputy County Counsel, for Plaintiff and Respondent.

Defendant and appellant M.O. (mother) has unresolved mental health issues that led to the court finding jurisdiction over her 12-year-old daughter, A.O., under Welfare and Institutions Code section 300, subdivision (b)[1] and removed her from mother's care. At the six-month review hearing, the court found that returning A.O. to mother would be detrimental to A.O. and that the Riverside County Department of Public Social Services (DPSS) had provided adequate reunification services. At the twelve-month review hearing, the court terminated reunification services and ordered that A.O. be placed in a Planned Permanent Living Arrangement.

Mother appeals the orders from the six- and twelve-month review hearings, and, citing the court's failure to advise her of her right to appeal after the disposition hearing, she also appeals the jurisdictional findings and dispositional order. We affirm jurisdiction and disposition but reverse the court's findings at the six- and twelve-month review hearings that DPSS had provided reasonable reunification services.

---

[1] All further statutory references are to the Welfare and Institutions Code.

I

FACTUAL AND PROCEDURAL BACKGROUND

This case involves A.O., a minor who was 12 years old at the time of detention but is now 14, and her mother, who suffers from bi-polar disorder and exhibits paranoid and aggressive tendencies. A.O.'s biological father has never been a part of her life.[2] Mother raised A.O. by herself and has been A.O.'s sole provider and caregiver for her entire life. Mother has an adult daughter, M.H., from a 22-year marriage that ended in 1995. That same year, mother was hospitalized under section 5150,[3] diagnosed with bi-polar disorder, and prescribed psychotropic medication. Mother stopped taking her medication after a few days because it was "not necessary." A.O. was born six years later, in 2001.

It is undisputed that mother has never intentionally or physically harmed A.O., and that mother and daughter love each other very much and share a strong emotional bond. At every step of the proceedings below, mother and A.O. persisted in wanting to live together and in failing to see why they should be apart. Nevertheless, mother's mental health issues impede her ability to safely parent A.O., and she has been unable to access psychotropic medication.

---

[2] Despite the Department's attempts to locate him, his whereabouts remained unknown throughout the proceeding.

[3] Section 5150 allows for the involuntary hospitalization of a person who "as a result of a mental health disorder, is a danger to others, or to himself or herself." (§ 5150, subd. (a).)

1. *The Petition and Detention*

On August 4, 2013, DPSS received an anonymous referral from the Riverside County Child Abuse Hotline expressing concerns about mother. According to the referral, the police had responded to mother's home because she was acting irrational and paranoid. Mother told the police that she believed there were child molesters in the neighborhood.

On August 7, 2013, a DPSS social worker arrived at mother's house to interview her regarding this incident. The social worker found mother's behavior to be paranoid, erratic, and strange. Mother made vague references to child molesters in her neighborhood, home invasions, and police investigations about inappropriate content that was planted in her computer and A.O.'s cell phone. At one point during the interview she said, "Shhh. I'm an actor . . . There is a sting operation."

Mother reported that in 1995, after her divorce, she had been hospitalized and diagnosed with bi-polar disorder and that she had been prescribed Haldol but "almost died" when she took it. She stated that she does not take medication and that there had not been any mental health concerns since 1995. She admitted to using marijuana with a friend three months prior, but stated that A.O. had not been present. She agreed to a drug test and tested negative for controlled substances.

The social worker also interviewed A.O., who was dressed appropriately and did not have any visible marks or bruises. A.O. denied any sexual abuse and told the social

4

worker that mother did not use drugs or alcohol. She felt safe with mother and wanted to continue living with her.

When asked about mother's recent behavior, A.O. said that mother had been "acting crazy this month," and that she did not like it. According to A.O., mother had contacted the police because she believed there were child molesters in the neighborhood. Mother also believed that someone was planting inappropriate content on their computers and phones.

Mother attended a team decision meeting on August 21, 2013 and agreed to participate in a psychological evaluation by August 28. On September 12, mother left a voicemail for the social worker saying, "I've been watching the streets. I'm sure you [are] keeping a close eye, the family and the villagers. I can smell it."

On September 25, 2013, DPSS received a second referral through the hotline alleging that A.O. had not been attending school since the academic year began on September 3. The social worker returned to mother's house on October 1. When asked whether she had completed a psychological evaluation, mother said she had not because she did not have insurance. She also told the social worker that she had completed the evaluation and that it was "none of [her] business." Throughout the interview, mother made comments about child molesters and about A.O. being cyber bullied. She admitted that she had been keeping A.O. out of school because she was "scared for [A.O.]'s safety" and felt it was unsafe for her to be in public. When asked if A.O. was on independent study, mother said yes and pointed to the author's name on a text book. The

5

social worker asked who the independent study was through and mother again pointed to the author's name. Mother called the social worker "disgusting" and ended the interview.

A.O.'s middle school had no knowledge of A.O. receiving independent studies. The school had also sent a health aid to mother's home because A.O. had not been attending school.

On October 2, 2013, mother called the social worker and told her that she and A.O. were being harassed when they walked down the street. She said that "people are breaking stuff around me to intimidate us . . . sirens, dropping things trying to make me fearful. I'm not hiding." She also said that A.O. is being "cyber bullied" and called a "whore."

The next day, DPSS arrived at mother's home to take A.O. into protective custody and place her in a foster home. Mother became aggressive towards the social worker. She asked why A.O. was being "arrested," and remarked that A.O. is "not even Mexican." Mother yelled in the social worker's face and the officers had to ask her to step away from the social worker several times. Mother swore at the social worker as she drove away with A.O. The officers had to assist mother in stepping away from the car.

A.O. began attending school shortly after she was placed in foster care. She told the social worker that she had not been attending school because mother is "paranoid" as a result of several hang-up phone calls. She also reported that mother had been unable to take her to and from school because she did not have a car. Mother believed someone had "super glued" the car's door locks and was sending ransom notes about the car.

Since she had not been attending school, A.O. had been spending 10 minutes to an hour each day completing old workbooks from the fifth grade. She reported that she was no longer allowed to go to friends' homes because of mother's safety concerns.

On October 7, 2013, DPSS filed the dependency petition, alleging that A.O. fell under the court's section 300, subdivision (b) jurisdiction because mother's conduct placed A.O. at a substantial risk of serious physical harm or illness. Specifically, DPSS alleged that mother placed A.O. at risk by: (1) failing to address her unresolved health issues, especially given that she had previously been hospitalized under section 5150 and diagnosed with bipolar disorder; (2) abusing marijuana; (3) neglecting A.O.'s educational needs; and (4) refusing to participate in DPSS's pre-placement preventative services and obtain a mental health assessment.

The court held the detention hearing on October 9, 2013. Before the hearing, mother tried to give A.O. breakfast, and when the social worker informed her that food was not allowed in the court, mother began yelling in the social worker's face. The social worker backed away but mother followed her, yelling. The social worker had to call the court deputy to intervene.

Mother's testimony at the detention hearing was vague and disjointed, and she often had to be redirected. She admitted that she had been hospitalized in 1995 and that she had been prescribed medication. She stated that she was "forced" to take medication and that she stopped taking it after a few days because it was "not necessary."

7

Much of mother's testimony involved her concerns about pedophiles. She testified that her research had revealed that there were 187 registered child molesters in her neighborhood. She believed that a father of one of A.O.'s friends was a pedophile and was "grooming" A.O. for sexual relations. Her reasons for this belief were scattered and seemed to consist of the fact that A.O. had gone camping with the family, the father has a "man cave" at the house, and the family has a puppy that "sits under a table for like six, seven hours." Mother admitted that A.O. denied experiencing any abuse by the father.

Mother's testimony on the topic of A.O.'s schooling was also difficult to follow, and at times contradictory. She claimed that the cyber bullying issue had stopped and that A.O. would be going back to school. She said that A.O. had been on independent studies "on and off" at the beginning of the school year.

Regarding the petition's allegation that she had not participated in a mental health assessment, mother stated that she had not been able to see a doctor because she did not have insurance. She said that the phone numbers for the referrals DPSS had given her at the team decision meeting were incorrect.

The court found that DPSS had presented prima facie evidence that A.O. fell under section 300, subdivision (b) and it detained A.O. from mother.

2. *Jurisdiction*

After the detention hearing, M.H., mother's adult daughter from her previous marriage, contacted DPSS. M.H. reported that mother suffers from "severe paranoia"

8

and had been diagnosed with bi-polar disease. M.H. does not maintain a relationship with mother because she is a "violent person" and refuses to take medication. Back when M.H.'s parents were still living together, mother had threatened to kill M.H. and was paranoid that M.H. had been sexually molested. Mother had also tried to run M.H.'s father over with her car inside a parking structure. After mother had been hospitalized in 1995, M.H. and her father discovered that she had been hiding knives under the sofa cushions in their house.

The social worker interviewed mother and A.O. again. Mother denied needing any services and stated that the only counseling her family needed was for A.O., who had been traumatized by the dependency proceedings.

A.O. told the social worker that her mother needed a " 'stress pill' so she is not always 'floppy' and all over the place." She reported that at the time she was removed from mother's house, they did not have running water. They had been drinking water from water bottles and showering at a neighbor's house. The water company was charging "a whole bunch of money and [mother] gets ticked."

A.O. also reported that mother has "paranoid trust issues." Mother had kept her out of school because she "wanted to be with just me and watching me" and "we didn't have a car to get there." Mother had also recently taken her out of dance classes because mother believed the dance teacher was "talking to somebody on the internet." A.O. stated, "it was weird because they thought my mom couldn't supervise me." A.O. had

seen mother become physically aggressive with A.O.'s paternal grandmother. The grandmother told mother that she "need[ed] a doctor" and mother slapped her.

A.O. liked her foster care placement, but was concerned about finding a placement alternative that would not upset mother. The social worker noted that A.O. was articulate, well-mannered, and appeared "parentified, as she commonly inquires about her mother's [well-being] and behavior."

In the three months leading up to the jurisdiction hearing, mother's behavior during visits and towards the social workers and the foster family was inappropriate and often aggressive. During visits, mother frequently talked about the case in front of A.O., despite constant redirection. For example, she referred to DPSS as "evil" and told A.O. that she was crying herself to sleep every night because of her removal.

During one visit, A.O. told mother that she had recently spoken with her half sister M.H. on the telephone. Mother responded, "you know she's against us . . . you know the truth, she wanted this to happen." A.O. and mother cried throughout this entire visit, and mother refused to leave the room when it ended. Afterwards, A.O. continued to cry and refused to talk to the social worker. She went into her room and began talking to imaginary friends.

Mother consistently berated and threatened the supervising DPSS social workers during visits. One of the social workers stated that she feared for her safety during visits and requested that they begin taking place in a therapeutic setting.

10

At a hearing on October 31, 2013, mother's counsel stated that mother wanted to submit to psychological evaluations and that she was requesting referrals for mental health care and a medication evaluation. The court appointed Dr. Michael Kania and Dr. Robert Suiter to conduct mental health evaluations pursuant to section 370. The court ordered visits to continue, but in a therapeutic setting, due to mother's inappropriate behavior during visits.

Dr. Kania evaluated mother on November 22, 2013. He reported that her thought processes were "extremely tangential and peculiar and it is difficult to keep her on track." Mother was also a "poor historian," and did not understand why A.O. had been removed from her custody. She did not trust Dr. Kania, and exhibited an "inability to cooperate," as well as elements of paranoid thinking and hypomania. Dr. Kania determined that mother's disorganized thought process and possible mood disorder were consistent with a bipolar disorder. He stated that her behavior during the assessment, as well as her "history of not having running water in her home, not taking her daughter to school, feeling that someone is 'grooming' her daughter and might sexually molest her," suggest that she is in need of psychological treatment. He opined that, until mother received treatment, which "should include at least a psychiatric medication evaluation and ongoing psychotherapy," he had "serious questions with regard to [mother's] ability to care for and protect her daughter." He also opined that after mother receives psychological treatment, "she may become more open to the possibility of receiving support in the home."

11

On November 11, 2013, mother went to the foster family's home while they were having a garage sale and told them to "Tell [A.O.] Happy Thanksgiving for me."

On November 25, DPSS referred mother to Indio Mental Health for a medication evaluation.

On December 2, 2013, security had to intervene and escort mother away after she pulled out a can of mace and stared at the social worker, saying "[A.O.] I finally got my mace. Now I can spray someone in the eyes." A.O. "apologized profusely" for her mother's behavior. Later, the social worker received a report that mother had been driving by the foster home with her windows down and music blaring. A few days later, mother arrived at a DPSS office and became aggressive towards the social worker. Mother accused the social worker of discriminating against her because she is Caucasian; she also called the social worker a "racist," and a "bigot."

On December 10, 2013, A.O. reported that she was nervous about visiting with mother because she could not predict what mother would say or do. She also reported that she was refraining from being in contact with relatives, including her older half sister, because she did not think mother would approve.

On December 14, mother drove to her daughter M.H.'s home in Colorado. M.H. called the police when mother refused to leave the house. Mother drove up and down M.H.'s driveway honking her horn and flashing her headlights.

On December 23, mother went to DPSS's office to ask the social worker about the rules of visitation and became combative when the social worker began to answer her

12

question. On December 30, after her visit was shortened in order to accommodate her request to change the visit time, mother had to be escorted out of the DPSS office for making threats against the social worker's life. Afterward, DPSS personnel noticed that mother was parked near a liquor store across from DPSS's facility, smoking cigarettes and staring at the facility. Fearing for her safety, the social worker called the police. The police told mother to leave and ended up having to force her to drive away. A.O. was extremely upset by the incident. She cried and called the social workers "a bunch of jerks."

Around this time, the social worker received calls from "various" relatives stating that mother's behaviors were escalating. These relatives wished to remain anonymous because they feared for their safety.

On January 3, 2014, the court held the jurisdiction hearing. The court granted DPSS's request to continue the disposition hearing because the report from Dr. Suiter's recent evaluation was not completed.

Mother testified that the allegations in DPSS's Jurisdiction/Disposition report about her inappropriate behavior during visits were "fabricated." She also asserted that her older daughter was lying and that she had not driven to Colorado to harass her. She denied that she suffers from mental illness and stated that she has not participated in counseling because it is "not necessary."

The court sustained the allegations in the petition and found that A.O. was a dependent of the court under section 300, subdivision (b).

3. *Disposition*

On January 23, 2014, DPSS filed Dr. Suiter's psychological evaluation. Dr. Suiter reported that mother believed A.O. had been abducted by a DPSS social worker and that it was difficult to follow her train of thought. Based on his evaluation, he believed that mother "could not care for a child at this juncture as she remains psychotic and hypomanic." He opined that she "is clearly in need of psychotropic medications which would most likely include antipsychotic and mood stabilizing medications." Mother "is also in need of individual psychotherapy to assist her to cope with her life circumstances and to assist her with her relapse prevention." Dr. Suiter stated that "[i]t would be overtly detrimental to place a child in the care of [mother] at this juncture and that will remain the case until such time as she is psychiatrically stabilized for a sustained period."

Also on January 23, DPSS checked the status of its medication evaluation referral and confirmed that it was still valid. To this point, mother had not participated in a medication evaluation.

On January 29, 2014, the court conducted the disposition hearing. Mother's counsel stated that she was "submitting as to family reunification services . . . If [mother] is being granted reunification services, she would like to be involved in those decisions." Counsel also asked for "immediate referrals for . . . the psychiatric or the mental health evaluation and the medication evaluation." A.O. filed a statement with the court, asking the court to allow her to go home and not to make mother take medication "because she hasn't taken it before and she was fine."

14

A.O.'s counsel stated that she had explained to her that it was "not possible" for her to go home at that point. The court told A.O. that it understood she wanted to go home, and that "[e]verybody's goal is to get you both back together." The court found that DPSS had presented clear and convincing evidence that returning A.O. to mother's care would be detrimental to A.O. under the circumstances set forth in section 361, subdivision (c)(1). The court ordered DPSS to provide mother with reunification services. It cautioned mother to comply with the case plan, which included counseling, psychotropic medication evaluation and monitoring, and substance abuse testing.

Mother did not file a notice of appeal challenging the court's jurisdictional findings or dispositional order.

4. *The Six-Month Review Hearing*

During the months leading up to this hearing, mother and A.O. did not have many supervised visits, but they did meet and speak with each other outside of DPSS's supervision. A.O. admitted that she had been secretly meeting up with her mother near school and that mother would give her prepaid cell phones so they could communicate. The social worker found two of these phones in A.O.'s room. A.O. told her foster mother and the social worker, "She's my mother and I want to see her."

A few weeks later, the foster mother found A.O. in the closet talking on the phone at 2 a.m. The foster mother phoned the number back and when mother answered, the foster mother told her not to call her home again.

Mother also harassed the foster family. In April 2014, she called the foster mother's adult daughter and said, "Look any criminal can get your phone number." The daughter told her that she had nothing to do with the case and mother began yelling at her. Mother called her back several times and left lengthy voice messages, in which she demonstrated that she knew the names of the foster mother's grandsons. Mother then began calling the foster mother's house and became verbally abusive. Both the foster mother and her daughter blocked mother's number to keep her from harassing them and they reported to the social worker that they were concerned for their safety.

On June 19, 2014, mother went to the Indio Mental Health Clinic for a medication evaluation. She told the doctor that she was only seeking the evaluation because her daughter was removed from her custody. She denied having mental health issues and stated that her 1995 hospitalization was "for no good reason." The doctor observed that mother rambled and appeared manic, but he concluded that she did not require medication.

At some point after disposition, a different social worker began working on the case. In the Status Review Report, this social worker reported that she had learned of the medication evaluation outcome on July 8, 2014. She also noted that Dr. Kania and Dr. Suiter had both opined that mother would benefit from medication. Based on mother's lack of progress, she recommended continued removal and an additional six months of services.

16

In September 2014, mother began attending counseling sessions at Family Services of the Desert with Dr. Gail Winston. In her report, Dr. Winston stated that mother "continues to have bizarre behavior, mainly paranoid and hypomanic with rage toward DPSS who she blames for kidnapping her daughter." She also stated that mother "refuses psych medication" and that DPSS's goals of assisting mother in "developing coping and parenting skills . . . appear unrealistic at this time."

At the six-month review hearing on October 6, 2014, mother testified that Dr. Winston had confused facts because she would sleep during therapy sessions. She testified that therapy was not helpful and that she had not "learned anything" during sessions. However, she did testify that she was willing to take medication if it would help get A.O. back.

The court ordered that A.O. remain out of mother's care and continued reunification services for six months. It found that DPSS had provided reasonable services.

Mother filed a notice of appeal challenging the courts findings and orders at the six-month review hearing on October 8, 2014.

5. *The Twelve-Month Review Hearing*

On October 9, 2014, Dr. Winston discharged mother from therapy on the basis that mother's mental health issues did not permit her to benefit from therapy or gain insight into her condition. The therapist stated that "[h]er need is to ventilate and blame [DPSS],

17

its social workers and this therapist." On October 30, 2014, DPSS referred mother to a new therapist, whom mother began seeing on November 4, 2014.

The social worker reported that A.O. was adjusting well to her foster care placement and appeared to have formed a close bond with her foster mother. A.O. was reaching her developmental milestones, making friends at her new school, and participating in school and church activities.

The therapist-monitored visits between mother and A.O. during this period went well. Mother consistently had to be redirected from referring to the case, but she did not become combative or verbally abusive, and A.O. appeared happy to see her. During these visits A.O. remained in close physical proximity to mother and expressed that she missed her. A.O. seemed "fine" and "normal" after each visit.

In the Status Review Report, the social worker recommended that the court terminate reunification services and place A.O. in a Planned Permanent Living Arrangement. She opined that A.O. would be at risk of harm if she were returned to mother's care because mother had not benefitted from the counseling services provided to her. She "remind[ed]" the court that two experts had opined that she could not safely parent A.O. and was in need of medication.

The court held the twelve-month review hearing on January 13, 2015. The social worker and mother testified. When asked for the basis of her opinion that A.O. would suffer detriment if returned home, the social worker cited Dr. Kania and Dr. Suiter's reports, which "stat[e] that the mother is not able to parent the child . . . until she takes

18

the prescribed medication." The social worker added, "If she is supposed to take medication, she is not taking it. . . . There are clients that I do know of that are on medication and doing very well with their children." When mother's counsel reminded the social worker that mother had participated in a medication evaluation but had been determined ineligible, the social worker responded that she had assumed the clinic had not prescribed medication because mother did not want medication. The social worker admitted that she had not followed up and asked mother about the medication evaluation.

Mother testified that she was enjoying her counseling sessions with the new therapist. She stated that her new therapist was "very nice," but did not know how to assist her except by offering advice on how to get along with people. Mother had recently stopped going to therapy and she explained that this was only because she had read the Status Review Report and was under the impression that her services had been terminated. Mother testified that she would take medication, "would take anything," if it meant that A.O. would be returned to her care.

The court found that returning A.O. to mother still posed a substantial risk of detriment to A.O.'s physical and emotional well-being under section 361, subdivision (c)(1). The court terminated reunification services, but found that a section 366.26 hearing terminating mother's parental rights would not be in A.O.'s best interests. It ordered weekly supervised visits and that A.O. be placed in a Planned Permanent Living

Arrangement with the specific goal of placement with a relative. Mother filed a notice of appeal on January 20, 2015.[4]

II

ANALYSIS

1. *The Merits of Jurisdiction and Disposition Should be Addressed*

Mother argues that there was insufficient evidence to support the court's jurisdictional findings and its dispositional order removing A.O. from her care. DPSS asserts that mother forfeited these arguments by failing to file a timely notice of appeal after the court issued the dispositional order. Mother concedes her appeal is untimely but asks that we reach the merits of her challenges to those rulings because the trial court violated rule 5.590(a) of the California Rules of Court (rule 5.590(a)) by failing to inform her of her right to appeal at the conclusion of the disposition hearing. We are not aware of any cases addressing the effect of the court's failure to advise a party of the right to appeal under rule 5.590(a). However, there are cases that address rule 5.590(b) of the California Rules of Court (rule 5.590(b)) and the effect of the court's failure to advise a party of the writ petition requirements for challenging the setting of a section 366.26 hearing. We find that precedent persuasive here.

---

[4] We ordered counsel to address all issues arising from this and the October 8, 2014 notice of appeal in one brief.

20

One of the most fundamental rules of appellate review is that the time for filing a notice of appeal is jurisdictional. "[O]nce the deadline expires, the appellate court has no power to entertain the appeal." (*Van Beurden Ins. Services, Inc. v. Customized Worldwide Weather Ins. Agency, Inc.* (1997) 15 Cal.4th 51, 56.) "The first appealable order in a dependency case is the dispositional order. . . . a challenge to the jurisdictional findings must be raised in an appeal from the dispositional order." (*In re T.W.* (2011) 197 Cal.App.4th 723, 729.) Mother should have filed a notice of appeal of the court's jurisdictional and dispositional orders within 60 days of January 29, 2014, the date of the dispositional order. (Cal. Rules of Court, rule 8.406(a).) It is only in very rare and " 'special circumstances constituting an excuse for failure to [timely appeal]' " that an appellate court may grant review of an appealable order by way of extraordinary writ after the deadline to appeal has passed. (*Mauro B. v. Superior Court* (1991) 230 Cal.App.3d 949, 953, citing *Adoption of Alexander S.* (1988) 44 Cal.3d 857, 865.)

Rule 5.590(a) states that "after making its disposition order," the court "*must* advise, orally or in writing*," the child, parent, or guardian of his or her right to appeal from the court order. (Italics added.) This mandate applies any time a court finds that dependency jurisdiction under section 300, 601, or 602 is proper. (Rule 5.590(a).) Similarly, rule 5.590(b) states that when a court orders a section 366.26 hearing, it "must advise" all parties of the requirements necessary to ensure extraordinary writ review of the order setting the hearing.

21

*In re Cathina W.* (1998) 68 Cal.App.4th 716 held that the juvenile court's failure to advise the mother of her writ rights entitled her to obtain appellate review of the merits of the order setting a section 366.26 hearing, even though the jurisdictional deadline for filing the notice of intent to file a writ petition had passed. (*Id.* at pp. 722-724 [applying a former rule of court requiring advisal].) The court concluded that the absence of the writ advisement constituted "good cause" for the mother's failure to file a writ petition. (*Id.* at p. 722.) Cases after *Cathina W.* have continued to provide appellate review to parties who did not receive the writ advisement from the court. (See, e.g., *In re Harmony B.* (2005) 125 Cal.App.4th 831, 839 [Fourth Dist., Div. Two].)

Based on this precedent, we hold that a court's failure to provide the appeal advisement contained in the same rule of court as the writ advisement is a " 'special circumstance[] constituting an excuse for failure to [timely appeal].' " (*Adoption of Alexander S.*, *supra*, 44 Cal.3d at p. 865.) We will therefore reach the merits of mother's challenges to jurisdiction and disposition by treating that portion of her appeal as a petition for an extraordinary writ.

We direct mother's attention to the rule that the notice of appeal must specify each particular order being appealed. (Cal. Rules of Court, rule 8.100(a)(2).) Nowhere in either of mother's notices did she specify that she was appealing jurisdictional and dispositional rulings. In the typical case, this defect would be fatal to her appeal of those rulings, because the rule is a jurisdictional one. (See, e.g., *Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 240.) However, because we find that

22

there is good cause for mother's late appeal, if we dismissed her challenge to those rulings on this ground, we would also grant her the opportunity to correct and re-file her notice document. In the interests of judicial economy, and because both parties have already fully briefed the issue of the validity of jurisdiction and disposition, we reach the merits of the issue without further delay.

DPSS urges us to deny review on the ground that the court was not required to give the rule 5.590(a) appeal advisement because mother had waived her right to appeal the jurisdictional and dispositional rulings. DPSS would have us find that this waiver occurred at the disposition hearing when mother's counsel stated that mother was "submitting as to reunification services." While a parent's submission "on the recommendation" of the social services agency can constitute waiver of any challenges to the court's order on appeal, mother did no such thing here.

Mother submitted solely on the issue of reunification services, she did not submit to DPSS's recommendation that the court assert jurisdiction over A.O. or remove A.O. from her care. The cases DPSS cites do not support a finding of waiver here because in those cases the parent submitted on the *entirety* of the agency's recommendation and made no effort to object or offer contradictory evidence to the court. (*In re Richard K.* (1994) 25 Cal.App.4th 580, 583, 589; *In re Kevin S.* (1996) 41 Cal.App.4th 882, 886.) Mother's submission to the reunification services aspect of DPSS's recommendation did not override her vigorous efforts to contest jurisdiction and removal.

23

2.  *Substantial Evidence Supports Jurisdiction*

Mother argues that the evidence was insufficient to support a finding under section 300, subdivision (b) that A.O. was at substantial risk of serious physical harm or illness as a result of her conduct.  We disagree.

Section 300, subdivision (b) provides for jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child."  (§ 300, subd. (b)(1).)  DPSS must establish by a preponderance of the evidence that allegations made under section 300 are true.  (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.)  We review the jurisdictional findings for substantial evidence and will affirm if "there is reasonable, credible evidence of solid value to support them.  [Citations.]"  (*Id.* at p. 1319.)

A section 300, subdivision (b) allegation has three elements:  (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) serious physical harm or illness to the child, or a substantial risk of such harm or illness.  (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)  In cases like this, where DPSS does not argue that the child *actually suffered* serious physical harm or illness as a result of the parent's failure to protect, DPSS must show that, at the time of the jurisdictional hearing, the child is at *substantial risk* of suffering such harm.  (§ 300, subd. (b)(1); *In re Jonathan B.* (2015) 235 Cal.App.4th 115, 119.)  In order to prove such a risk, DPSS must demonstrate a connection between past behavior and a defined risk of future harm, as well as a reason

to believe the behavior will continue in the future. (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 824.)

Here, DPSS presented evidence that mother had exhibited violent behavior towards family members as a result of her bi-polar disorder in the past, as well as evidence that mother was currently suffering from the same disorder and exhibiting violent behavior. According to M.H., as a result of mother's disorder, she had become paranoid to the point of hiding knives throughout the house, had threatened to kill her own daughter, and had attempted to kill her ex-husband. M.H.'s account constitutes substantial evidence of what could happen if mother's mental health issues went untreated. Dr. Kania's evaluation was substantial evidence that mother was currently suffering from the same mental health issues that she had suffered from in the past, namely, bi-polar disorder with manic and paranoid tendencies. Mother's behavior towards DPSS employees, the foster family, and her own family leading up to the jurisdiction hearing was substantial evidence that she was currently exhibiting the same violent or aggressive behaviors that she had demonstrated in the past.

Additionally, DPSS presented evidence that mother was neglecting A.O.'s needs by keeping her out of school and failing to maintain water service to the home. This neglect, on its own, may not be sufficient to warrant jurisdiction under section 300,

subdivision (b)[5]; however, when coupled with the evidence just described, it demonstrates a connection between mother's past dangerous conduct and her conduct at the time of the jurisdiction hearing. We conclude that, based on this record, the court could readily conclude that there was a likelihood that mother's dangerous behavior would continue into the future and create a significant danger of serious physical harm to A.O.

Mother argues that mental illness alone is not a ground for establishing jurisdiction over a child and that none of her actions had actually placed A.O. at a substantial risk of serious physical harm. While it is true that mental illness alone is not sufficient to prove that a child is at substantial risk of serious physical harm (see, e.g., *In re A.G.* (2013) 220 Cal.App.4th 675, 684), this is not a case where DPSS recommended jurisdiction on the sole basis of a mental illness diagnosis. Mother's diagnosis was one factor among many that informed DPSS's jurisdiction recommendation. For example, the fact that mother had been involuntarily hospitalized for bi-polar disorder in the past, had been evaluated by an expert who believed she could not safely parent A.O., and had been refusing to acknowledge her condition or take medication also informed DPSS's recommendation.

---

[5] In *In re Janet T.* (2001) 93 Cal.App.4th 377, the court held that mother's failure to send her children to school for several months, while "very detrimental" to the children, did not place them at substantial risk of serious physical harm or illness to warrant jurisdiction under section 300, subdivision (b). (*Id.* at pp. 388-389.)

Additionally, mother overlooks the aggressive way in which she was interacting with those involved with the dependency proceedings. DPSS presented evidence that she had become combative toward social workers on multiple occasions, to the point where the social worker's feared for their physical safety and summoned security. DPSS also presented evidence that, before the jurisdiction hearing, mother had driven to Colorado to harass her daughter M.H., and that family members were concerned for their safety around mother because her paranoid and aggressive behaviors were escalating.

The cases mother cites to support her position that jurisdiction was improper here are inapplicable. In *In re Matthew S.* (1996) 41 Cal.App.4th 1311, the mother suffered from the delusion that her 13-year-old son's penis had been mutilated, and she took her son to a urologist who found no evidence of any injury. (*Id.* at p. 1315.) The court reversed jurisdiction under section 300, subdivision (b) on the ground that her mental health issues did not place her son at substantial risk of serious physical harm. (*Id.* at p. 1319.) This case is distinguishable because the mother there had acknowledged her mental health issues, participated in extensive treatment, took medication as necessary, and her treating psychologist recommended that the children remain living in her care. (*Id.* at pp. 1316-1317.) Here, at the time of the jurisdiction hearing, mother refused therapy as "unnecessary."

*In re A.G.*, *supra*, 220 Cal.App.4th 675 is also inapplicable because there, even though the mother suffered undisputed and extreme mental health issues, the children were not at a substantial risk of serious harm because they had a father who showed

27

"remarkable dedication" to protecting them from her dangerous conduct. (*Id.* at pp. 680, 684.) *In re David M.* (2005) 134 Cal.App.4th 822 is inapplicable because there the social services agency made allegations based on dated and unverified information which turned out to fall "a great distance . . . [from] the evidence adduced at the jurisdiction hearing." (*Id.* at p. 825.) The agency alleged that the father suffered from anxiety and depression and that the mother abused marijuana. (*Id.* at pp. 825-826.) However, the evidence presented at the hearing demonstrated that the parents provided a safe, clean home and that their newborn infant had been born drug free. (*Id.* at p. 830.)

Here, unlike these cases, there was no other parent that could safely care for A.O., and DPSS had presented the evaluation of an expert who opined that mother could not safely care for A.O. in her current state and without psychotherapy and medication. At the time of the jurisdiction hearing, mother had not participated in a medication evaluation despite having a referral from DPSS and she refused therapy as "unnecessary." Mother's focus on the fact that there was no evidence that A.O. had ever been physically harmed overlooks the real danger that mother was creating for her daughter. By failing to acknowledge her mental health issues and address them with medication, mother was continually risking the chance that she would have another hospitalization incident or exhibit irrational, threatening behavior like she had in the past.

Because we conclude that allegation b-1 is supported by substantial evidence and warrants jurisdiction under section 300, subdivision (b), we need not address mother's arguments concerning the evidence supporting allegations b-2 through b-4. (*In re*

28

*Christopher C.* (2010) 182 Cal.App.4th 73, 83 [" 'jurisdiction may rest on a single ground' "].)

    3.  *Substantial Evidence Supports Removal*

Mother argues that there was insufficient evidence at the disposition hearing to support a finding that A.O. would be at substantial risk of harm if returned to her care. Again, we disagree.

A parent has a fundamental right to care for and have custody of her child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306.) Removal is "a last resort, to be considered only when the child would be in danger if allowed to reside with the parent." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.) Thus, before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without [removal]." (§ 361, subd. (c)(1).)

However, "[t]he parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) "The focus of the statute is on averting harm to the child. [Citations.] In this regard, the court may consider the parent's past conduct as well as present circumstances." (*Ibid.*) We review a court's dispositional order for substantial evidence. (*In re T.V.* 217 Cal.App.4th 126, 136.)

The evidence that supports the court's jurisdictional finding was also sufficient to satisfy DPSS's burden of presenting clear and convincing evidence of the need for removal. As just explained, mother had been evaluated as incapable of safely parenting A.O. as a result of her mental health issues, and she was exhibiting aggressive behaviors to family members and those involved in the dependency proceedings. She saw therapy as unnecessary, and had not participated in a medication evaluation.

In addition to this evidence, by the time of the disposition hearing, DPSS had also presented the opinion of the second court-appointed expert. This expert also opined that mother could not safely parent A.O. In his opinion, placing A.O. in mother's care would be "overtly detrimental" to A.O., at least until she began treatment in the form of psychotropic medication and psychotherapy.

We recognize that mother asked for immediate medication evaluation referrals at the disposition hearing, but this request was too late to avert a detriment finding. Moreover, mother did not explain why she had not taken advantage of the medication evaluation that DPSS had already given her.

In short, the court had before it the opinion of two experts that mother was currently a danger to her child. At the time of disposition, mother had chosen to focus her energy on fighting with family members and those involved in A.O.'s care instead of utilizing the services DPSS had provided to help her treat her mental health issues.

30

Citing *In re Jamie M.* (1982) 134 Cal.App.3d 530 (*Jamie M.*), mother states the well-established rule that section 361, subsection (c) harm cannot be presumed from the fact that a parent was diagnosed with a mental illness. In that case, the basis for the juvenile court's removal order was that mother had been diagnosed as a schizophrenic. (*Id.* at p. 537.) However, the record demonstrated that drug therapy had been "very effective in controlling [the mother's] illness," and that, at the time of the disposition hearing, she "was rational and coherent [and] . . . was under psychiatric care on outpatient status and had returned to her drug therapy." (*Ibid.*) The court stated, "[r]ather than mandating a specific disposition because the mother is schizophrenic, the diagnosis should lead to an in-depth examination of her psychiatric history, her present condition, her previous response to drug therapy, and the potential for future therapy." (*Id.* at p. 540.) Refusing to "assum[e] that a schizophrenic parent is ipso facto an unfit parent," the court held that the mother's diagnosis was an insufficient ground for removal. (*Ibid.*)

This case is a far cry from *Jamie M.* First, the court here had more than a bi-polar diagnosis before it when it issued the removal order. It had numerous examples of mother's aggressive and paranoid behavior, as well as opinions from two experts on the potential impacts of mother's diagnosis on her ability to parent. Second, unlike the mother in *In re Jamie M.*, mother was not taking medication, found therapy unnecessary, and was frequently less than "rational and coherent." (*Jamie M.*, *supra*, 134 Cal.App.3d at p. 537.) Unlike *Jamie M.*, our record is devoid of evidence as to whether drug therapy

31

would be effective in controlling mother's mental health issues, due to her historical resistance to taking medication.

Mother also argues that the court failed to satisfy its obligation to consider alternatives to removal. She asserts that she would have participated in counseling and taken medication if A.O. had been returned to her. This argument ignores the purpose of disposition proceedings, which is to avoid harm to the child. (See, e.g., *In re Cole C.*, *supra*, 174 Cal.App.4th at p. 917.) It would contravene this purpose to identify a risk of harm to a child and then allow that child to return home, so long as the parent promised to take steps to alleviate the risk. Mother cannot condition her compliance with her safety plan on her daughter's return. Mother was informed of what she could do to make A.O.'s return more likely, i.e., participate in treatment and take appropriate medication. She failed to take those steps.

4. *DPSS Failed to Provide Reasonable Services After Disposition*

Mother argues that she was put in an impossible position during the reunification period: DPSS based its detriment opinion on the fact that she was not taking medication, but when she participated in an evaluation, she was denied medication by DPSS's referred clinic. After this denial, DPSS did not refer mother to another clinic, but it continued to opine that she posed a significant risk of harm to A.O. Mother argues that the court's reasonable services findings at the six- and twelve-month review hearings were therefore not supported by substantial evidence. We agree.

32

As a preliminary matter, we reject DPSS's argument that mother has waived a challenge to services because she failed to raise the issue with the juvenile court. "A parent is 'not required to complain about the lack of reunification services as a prerequisite to the department fulfilling its statutory obligations.' " (*Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1157, 1158 [the mother did not forfeit her lack of reasonable services argument by raising it for the first time on appeal].) Mother may raise this argument on appeal.

"A finding that reasonable reunification services have been provided must be made upon clear and convincing evidence." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) "When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence." (*Ibid.*)

"Reunification services implement the law's strong preference for maintaining the family relationship if at all possible. Consequently [the department] must make a " ' "good faith effort" ' " to provide reasonable services responsive to the unique needs of each family through a plan that is " 'specifically tailored to fit the circumstances of each family [citation], and . . . designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. [Citation.]' " (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451.) "[A parent's] difficulty meeting the case plan's requirements does not excuse the agency from continuing its effort to bring [the parent] into compliance with the court's orders." (*Ibid.*)

33

Throughout this case, DPSS's main concerns with mother's ability to parent A.O. have been her refusal to *acknowledge* her mental health issues and her failure to *undergo treatment* to manage the risks those issues pose to A.O. At the time of the six- and twelve-month review hearings, DPSS had made several attempts to assist mother in obtaining counseling. Its efforts on that front are commendable. However, when it came to obtaining a medication evaluation, DPSS gave mother a referral to a clinic, but never followed up with her once it learned that the clinic had concluded she was ineligible for medication.

DPSS learned of mother's inability to obtain medication from its referred clinic on July 8, 2014. By the time of the six-month hearing three months later, DPSS had not given mother another referral for a medication evaluation or taken any other steps to help her obtain medication. By our review of the record, the only step DPSS took before the six-month hearing was to ask the clinic why it had concluded mother was ineligible for medication. DPSS did not follow up any further during the time leading up to the twelve-month review hearing.

While the blame for mother's failure to obtain medication falls on both mother and DPSS, mother's failure was a result of her condition. Her mental health issues necessitating drug therapy are precisely what interfered with her ability to obtain medication services.

In *In re K.C.* (2012) 212 Cal.App.4th 323 (*K.C.*), a case where the father was placed in a similar situation to mother's, the court held that the department had not provided reasonable services to help the father obtain psychotropic medication. (*Id.* at p. 334.) The department had alleged that the father "tended to minimize potential hazards to the children, to resist advice . . . and to mistrust other persons necessarily involved in their care." (*Id.* at p. 326.) A court-appointed expert opined that the father likely suffered from multiple psychological disorders, including schizophrenia, and that these conditions interfered with his ability to address the issues causing his children's removal. (*Id.* at pp. 326, 329.) The expert recommended treatment through therapy and psychotropic medication. (*Id.* at p. 326.)

When the social worker discussed the possibility of medication with the father, he responded, " " 'You would have to tie me down to get me to take medication. I don't believe in the stuff.' " " (*K.C.*, *supra*, 212 Cal.App.4th at pp. 326-327.) On another occasion he told the social worker, " 'I am happy with my life. I don't see how medication would help me. I don't have any problems.' " (*Id.* at p. 327.) Nevertheless, he agreed to participate in a medication evaluation. (*Ibid.*) The department referred him to a public mental health clinic with the advice that he present himself as open to receiving medication, as opposed to being forced by the department to attend the evaluation. (*Ibid.*) After his second unsuccessful attempt to obtain an evaluation at the clinic, the social worker advised him to bring his therapist to the next evaluation. (*Ibid.*)

35

On the third attempt, the therapist accompanied him to the clinic, but he was again denied an evaluation. (*Ibid.*)

On appeal, the father challenged the juvenile court's finding that the department had provided reasonable services. (*K.C.*, *supra*, 212 Cal.App.4th at p. 329.) The department cited the father's unwillingness to cooperate with his safety plan and his inability to acknowledge his mental health issues. (*Id.* at p. 330.)

The court rejected the department's argument. It stated that had the father refused to submit to a medication evaluation or refused to take medication that had been prescribed to him, "his refusal would presumably have sustained a finding that reasonable services were provided." (*Id.* at p. 330.) However, because he was open to obtaining a medication evaluation, the department was required to make an "effort . . . to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success." (*Id.* at p. 329.) The court found that, instead of making that effort, the department had "delegate[d] the burden of finding and obtaining suitable services to [the father]—*despite the high likelihood that the very issues necessitating treatment would interfere with his ability to obtain it.*" (*Id.* at p. 330, italics added.) It concluded that the department's "failure to consider other service providers when the public clinic declined to provide the needed evaluation" was unjustified. (*Id.* at p. 331.)

In rejecting the department's argument that the medication evaluation was "futile," due to "[the father's] stated opposition to psychotropic medications," the court reasoned that not wanting to take medication and not being willing to do so "are two

36

different things." (*K.C.*, *supra*, 212 Cal.App.4th at p. 331.) "A person may not want to undergo treatment, but that does not mean he will refuse to do so when the treatment is offered. Here it was never offered." (*Ibid.*) In other words, the department failed to show that the father "would in fact have refused medication if presented with a choice between taking it and permanently losing custody of his children." (*Ibid.*)

Similarly here, DPSS failed to consider other providers when its referred clinic determined mother was ineligible for medication. Like in *K.C.*, mother's psychological evaluations revealed that her mental health issues interfered with her ability to acknowledge her condition or trust those involved in the removal of A.O. However, mother consistently told the court and DPSS that she was willing to take medication if it meant A.O.'s possible return. In light of her willingness to take medication, and her attempt to obtain medication, DPSS's failure to take any additional steps to help mother obtain a second medication evaluation, such as referring her to a different clinic, or suggesting that a therapist accompany her to an evaluation, is unreasonable.

DPSS attempts to distinguish *K.C.* on the ground that it involved a failed attempt to obtain an *evaluation*, whereas here, mother obtained the evaluation, just not the *prescription*. We do not read the holding of *K.C.* so narrowly. The court was concerned with DPSS's lack of effort to help the father obtain psychotropic medications, a treatment option that, according to the expert, may have increased his chance of reunifying with his children. (*K.C.*, *supra*, 212 Cal.App.4th at p. 326.) The fact that mother made it one step closer to obtaining medication than the father in *K.C.* does not

change the analysis. The result for both parents was the same: they were unable to access treatment that could possibly reunify their families. In our view, finding *K.C.* distinguishable on the evaluation-versus-prescription point does not promote reunification.

Thus, we conclude that there was insufficient evidence at both the six- and twelve-month review hearings to support a finding that DPSS provided reasonable reunification services. When mother's therapy sessions with Dr. Winston did not work out, DPSS gave her a referral for a new therapist. DPSS should have done at least this much with regard to medication, namely, provided mother with another medication evaluation referral. In reaching this conclusion, we are not suggesting that DPSS must secure a prescription for psychotropic medication in order for the court to make a reasonable services finding on remand. Mother should simply be afforded another chance to obtain a prescription for psychotropic medication and to participate in therapy, as necessary. If after mother is given an opportunity to obtain medication she fails to commence a medication program (either because she convinces the medication evaluators that medication is unnecessary or because she refuses to take medication once prescribed), the trial court may properly find that DPSS provided mother with a reasonable chance to reunify and she failed to take advantage of the opportunity.

We therefore direct the juvenile court to vacate its reasonable services findings from both the six- and twelve-month review hearings. "When it appears at the six-month review hearing that a parent has not been afforded reasonable reunification services, the

38

remedy is to extend the reunification period, and order continued services." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 973-974.) Where, as here, the juvenile court "found the services to have been reasonable, [and] . . . ordered an additional six months of services, just as it would have done, had it found that reasonable services had not been provided," the court's order must nevertheless be reversed, in order to protect against "prejudice to [the parent] from the ruling [that] will come later, at each successive phase of the proceedings." (*Id.* at p. 974, citing *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1015-1016.)

Our conclusion makes it unnecessary to address mother's further contentions, such as her argument that the visitation schedule was unreasonable. We assume that on remand the court will reexamine visitation issues if mother shows progress as a result of commencing a medication program.

III

DISPOSITION

The court's orders issued at the six- and twelve-month review hearings are reversed only with regard to the findings that DPSS provided mother reasonable reunification services, and those findings are vacated. The case is remanded to the court to enter a new order finding that, as of the six- and twelve-month review hearings, DPSS failed to provide mother with reasonable reunification services. On remand, the court shall order DPSS to provide mother with reasonable reunification services that are consistent with her case plan. At a minimum, the court shall order DPSS to provide

39

services designed to give mother an opportunity to commence a psychotropic medication program, such as medication evaluation referrals and therapy, as necessary. These services shall be provided for a length of time that is reasonable in light of the circumstances existing when the court enters the new order and that will allow mother a meaningful opportunity to reunify with A.O. (See *In re Taylor J.*, *supra*, 223 Cal.App.4th at p. 1453; *In re Alvin R.*, *supra*, 108 Cal.App.4th at p. 975.)

CODRINGTON      
J.

We concur:

KING      
      Acting P. J.

MILLER      
      J.

Filed 11/12/15

**CERTIFIED FOR PARTIAL PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re A.O., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E062111 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ1300355) |
| v. | ORDER MODIFYING OPINION AND GRANTING PARTIAL PUBLICATION |
| M.O., | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

IT IS ORDERED that the opinion filed in this matter on October 14, 2015 is modified as follows:

Delete the first sentence in the second paragraph on page 21 of Part II.1. reading,

Rule 5.590(a) states that "after making its disposition order," the court "*must*

advise, orally or in writing," the child, parent, or guardian of his or her right to

appeal from the court order. (Italics added.)

1

It shall be replaced with the following sentence:

Rule 5.590(a) states that "after making its disposition order," the court "*must* advise, orally or in writing, the child, if of sufficient age, and, if present, the parent or guardian of . . . [t]he right of the child, parent, and guardian to appeal from the court order. . . ." (Italics added.)

IT IS FURTHER ORDERED that certification of the opinion for nonpublication dated October 14, 2015 is hereby vacated and set aside. On pages 1 and 40 of the opinion, the words NOT TO BE PUBLISHED IN OFFICIAL REPORTS are replaced with the words CERTIFIED FOR PARTIAL PUBLICATION and those words on page 1 are followed by insertion of the following footnote:

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II.2, II.3, II.4, and III.

IT IS FURTHER ORDERED that the request for publication of the opinion filed on October 14, 2015 is GRANTED with the exception of parts I, II.2, II.3, II.4, and III. The opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c).

Except for these modifications, the opinion remains unchanged.  These modifications do not effect a change in judgment.

CERTIFIED FOR PARTIAL PUBLICATION

CODRINGTON          
                                                                                    J.

We concur:

KING                              
               Acting P. J.

MILLER                    
               J.

3